# INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, ET AL. v. BAGWELL ET AL.

No. 92–1625.   Argued November 29, 1993—Decided June 30, 1994

BLACKMUN, J., delivered the opinion for a unanimous Court with respect to Parts I, II–A, II–C, and III, and the opinion of the Court with respect to Part II–B, in which STEVENS, O'CONNOR, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. SCALIA, J., filed a concurring opinion, *post*, p. 839. GINSBURG, J., filed an opinion concurring in part and concurring in the judgment, in which REHNQUIST, C. J., joined, *post*, p. 844.

*Laurence Gold* argued the cause for petitioners. With him on the briefs were *Robert H. Stropp, Jr., Walter Kamiat, Andrew P. Miller, Virginia A. Seitz,* and *David L. Shapiro.*

*John G. Roberts, Jr.,* argued the cause for respondents. With him on the briefs were *William B. Poff, Clinton S. Morse, Frank K. Friedman,* and *David G. Leitch.*

*Deputy Solicitor General Bender* argued the cause for the United States urging affirmance. With him on the brief

were *Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Kneedler,* and *Miguel A. Estrada.**

JUSTICE BLACKMUN delivered the opinion of the Court.

We are called upon once again to consider the distinction between civil and criminal contempt. Specifically, we address whether contempt fines levied against a union for violations of a labor injunction are coercive civil fines, or are criminal fines that constitutionally could be imposed only through a jury trial. We conclude that the fines are criminal and, accordingly, we reverse the judgment of the Supreme Court of Virginia.

I

Petitioners, the International Union, United Mine Workers of America, and United Mine Workers of America, District 28 (collectively, the union), engaged in a protracted labor dispute with the Clinchfield Coal Company and Sea "B" Mining Company (collectively, the companies) over alleged unfair labor practices. In April 1989, the companies filed suit in the Circuit Court of Russell County, Virginia, to enjoin the union from conducting unlawful strike-related activities. The trial court entered an injunction which, as later amended, prohibited the union and its members from, among other things, obstructing ingress and egress to company facilities, throwing objects at and physically threatening company employees, placing tire-damaging "jackrocks" on roads used by company vehicles, and picketing with more than a specified number of people at designated sites. The court additionally ordered the union to take all steps necessary to ensure compliance with the injunction, to place su-

---

*\*Bertram R. Gelfand* and *Jeffrey C. Dannenberg* filed a brief for the Allied Educational Foundation as *amicus curiae* urging reversal.

*Michael E. Avakian* filed a brief for the Center on National Labor Policy, Inc., as *amicus curiae* urging affirmance.

pervisors at picket sites, and to report all violations to the court.   App. to Pet. for Cert. 114a–116a.

On May 18, 1989, the trial court held a contempt hearing and found that petitioners had committed 72 violations of the injunction.   After fining the union $642,000 for its disobedience,[1] the court announced that it would fine the union $100,000 for any future violent breach of the injunction and $20,000 for any future nonviolent infraction, "such as exceeding picket numbers, [or] blocking entrances or exits."   *Id.,* at 111a.   The court early stated that its purpose was to "impos[e] prospective civil fines[,] the payment of which would only be required if it were shown the defendants disobeyed the Court's orders."   *Id.,* at 40a.

In seven subsequent contempt hearings held between June and December 1989, the court found the union in contempt for more than 400 separate violations of the injunction, many of them violent.   Based on the court's stated "intention that these fines are civil and coercive," *id.,* at 104a, each contempt hearing was conducted as a civil proceeding before the trial judge, in which the parties conducted discovery, introduced evidence, and called and cross-examined witnesses.   The trial court required that contumacious acts be proved beyond a reasonable doubt, but did not afford the union a right to jury trial.

As a result of these contempt proceedings, the court levied over $64 million in fines against the union, approximately $12 million of which was ordered payable to the companies. Because the union objected to payment of any fines to the companies and in light of the law enforcement burdens posed by the strike, the court ordered that the remaining roughly $52 million in fines be paid to the Commonwealth of Virginia and Russell and Dickenson Counties, "the two counties most heavily affected by the unlawful activity."   *Id.,* at 44a–45a.

---

[1] A portion of these fines was suspended conditioned on the union's future compliance.   The court later vacated these fines, concluding that they were " 'criminal in nature.' "   App. to Pet. for Cert. 4a, n. 2.

While appeals from the contempt orders were pending, the union and the companies settled the underlying labor dispute, agreed to vacate the contempt fines, and jointly moved to dismiss the case. A special mediator representing the Secretary of Labor, App. 48–49, and the governments of Russell and Dickenson Counties, *id.*, at 48 and 54, supported the parties' motion to vacate the outstanding fines. The trial court granted the motion to dismiss, dissolved the injunction, and vacated the $12 million in fines payable to the companies. After reiterating its belief that the remaining $52 million owed to the counties and the Commonwealth were coercive, civil fines, the trial court refused to vacate these fines, concluding they were "payable in effect to the public." App. to Pet. for Cert. 47a.

The companies withdrew as parties in light of the settlement and declined to seek further enforcement of the outstanding contempt fines. Because the Commonwealth Attorneys of Russell and Dickenson Counties also had asked to be disqualified from the case, the court appointed respondent John L. Bagwell to act as Special Commissioner to collect the unpaid contempt fines on behalf of the counties and the Commonwealth. *Id.*, at 48a.

The Court of Appeals of Virginia reversed and ordered that the contempt fines be vacated pursuant to the settlement agreement. Assuming for the purposes of argument that the fines were civil, the court concluded that "civil contempt fines imposed during or as a part of a civil proceeding between private parties are settled when the underlying litigation is settled by the parties and the court is without discretion to refuse to vacate such fines." *Mine Workers* v. *Clinchfield Coal Co.*, 12 Va. App. 123, 133, 402 S. E. 2d 899, 905 (1991).

On consolidated appeals, the Supreme Court of Virginia reversed. The court held that whether coercive, civil contempt sanctions could be settled by private parties was a question of state law, and that Virginia public policy disfa-

vored such a rule, "if the dignity of the law and public respect for the judiciary are to be maintained." 244 Va. 463, 478, 423 S. E. 2d 349, 358 (1992). The court also rejected petitioners' contention that the outstanding fines were criminal and could not be imposed absent a criminal trial. Because the trial court's prospective fine schedule was intended to coerce compliance with the injunction and the union could avoid the fines through obedience, the court reasoned, the fines were civil and coercive and properly imposed in civil proceedings:

> "When a court orders a defendant to perform an affirmative act and provides that the defendant shall be fined a fixed amount for each day he refuses to comply, the defendant has control of his destiny. The same is true with respect to the court's orders in the present case. A prospective fine schedule was established solely for the purpose of coercing the Union to refrain from engaging in certain conduct. Consequently, the Union controlled its own fate." *Id.*, at 477, 423 S. E. 2d, at 357.

This Court granted certiorari. 508 U. S. 949 (1993).

## II

### A

"Criminal contempt is a crime in the ordinary sense," *Bloom* v. *Illinois*, 391 U. S. 194, 201 (1968), and "criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings," *Hicks* v. *Feiock*, 485 U. S. 624, 632 (1988). See *In re Bradley*, 318 U. S. 50 (1943) (double jeopardy); *Cooke* v. *United States*, 267 U. S. 517, 537 (1925) (rights to notice of charges, assistance of counsel, summary process, and to present a defense); *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418, 444 (1911) (privilege against self-incrimination, right to proof beyond a reasonable doubt). For "serious" criminal contempts involving impris-

onment of more than six months, these protections include the right to jury trial. *Bloom*, 391 U. S., at 199; see also *Taylor* v. *Hayes*, 418 U. S. 488, 495 (1974). In contrast, civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is required.[2]

Although the procedural contours of the two forms of contempt are well established, the distinguishing characteristics of civil versus criminal contempts are somewhat less clear.[3] In the leading early case addressing this issue in the context of imprisonment, *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S., at 441, the Court emphasized that whether a contempt is civil or criminal turns on the "character and purpose" of the sanction involved. Thus, a contempt sanction is considered civil if it "is remedial, and for the benefit of the com-

---

[2] We address only the procedures required for adjudication of indirect contempts, *i. e.*, those occurring out of court. Direct contempts that occur in the court's presence may be immediately adjudged and sanctioned summarily, see, *e. g., Ex parte Terry*, 128 U. S. 289 (1888), and, except for serious criminal contempts in which a jury trial is required, *Bloom* v. *Illinois*, 391 U. S. 194, 209–210 (1968), the traditional distinction between civil and criminal contempt proceedings does not pertain, cf. *United States* v. *Wilson*, 421 U. S. 309, 316 (1975).

[3] Numerous scholars have criticized as unworkable the traditional distinction between civil and criminal contempt. See, *e. g.*, Dudley, Getting Beyond the Civil/Criminal Distinction: A New Approach to the Regulation of Indirect Contempts, 79 Va. L. Rev. 1025, 1033 (1993) (describing the distinction between civil and criminal contempt as "conceptually unclear and exceedingly difficult to apply"); Martineau, Contempt of Court: Eliminating the Confusion between Civil and Criminal Contempt, 50 U. Cin. L. Rev. 677 (1981) ("Few legal concepts have bedeviled courts, judges, lawyers and legal commentators more than contempt of court"); Moskovitz, Contempt of Injunctions, Civil and Criminal, 43 Colum. L. Rev. 780 (1943); R. Goldfarb, The Contempt Power 58 (1963) (describing "the tangle of procedure and practice" resulting from this "unsatisfactory fiction").

plainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court." *Ibid.*

As *Gompers* recognized, however, the stated purposes of a contempt sanction alone cannot be determinative. *Id.,* at 443. "[W]hen a court imposes fines and punishments on a contemnor, it is not only vindicating its legal authority to enter the initial court order, but it also is seeking to give effect to the law's purpose of modifying the contemnor's behavior to conform to the terms required in the order." *Hicks,* 485 U. S., at 635. Most contempt sanctions, like most criminal punishments, to some extent punish a prior offense as well as coerce an offender's future obedience. The *Hicks* Court accordingly held that conclusions about the civil or criminal nature of a contempt sanction are properly drawn, not from "the subjective intent of a State's laws and its courts," *ibid.,* but "from an examination of the character of the relief itself," *id.,* at 636.

The paradigmatic coercive, civil contempt sanction, as set forth in *Gompers,* involves confining a contemnor indefinitely until he complies with an affirmative command such as an order "to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance." 221 U. S., at 442; see also *McCrone* v. *United States,* 307 U. S. 61, 64 (1939) (failure to testify). Imprisonment for a fixed term similarly is coercive when the contemnor is given the option of earlier release if he complies. *Shillitani* v. *United States,* 384 U. S. 364, 370, n. 6 (1966) (upholding as civil "a determinate [2-year] sentence which includes a purge clause"). In these circumstances, the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus " 'carries the keys of his prison in his own pocket.' " *Gompers,* 221 U. S., at 442, quoting *In re Nevitt,* 117 F. 448, 451 (CA8 1902).

By contrast, a fixed sentence of imprisonment is punitive and criminal if it is imposed retrospectively for a "completed act of disobedience," *Gompers,* 221 U. S., at 443, such that

the contemnor cannot avoid or abbreviate the confinement through later compliance. Thus, the *Gompers* Court concluded that a 12-month sentence imposed on Samuel Gompers for violating an antiboycott injunction was criminal. When a contempt involves the prior conduct of an isolated, prohibited act, the resulting sanction has no coercive effect. "[T]he defendant is furnished no key, and he cannot shorten the term by promising not to repeat the offense." *Id.*, at 442.

This dichotomy between coercive and punitive imprisonment has been extended to the fine context. A contempt fine accordingly is considered civil and remedial if it either "coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained." *United States* v. *Mine Workers*, 330 U. S. 258, 303–304 (1947). Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge. See *Penfield Co. of Cal.* v. *SEC*, 330 U. S. 585, 590 (1947). Thus, a "flat, unconditional fine" totaling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance. *Id.*, at 588.

A close analogy to coercive imprisonment is a per diem fine imposed for each day a contemnor fails to comply with an affirmative court order. Like civil imprisonment, such fines exert a constant coercive pressure, and once the jural command is obeyed, the future, indefinite, daily fines are purged. Less comfortable is the analogy between coercive imprisonment and suspended, determinate fines. In this Court's sole prior decision squarely addressing the judicial power to impose coercive civil contempt fines, *Mine Workers*, *supra*, it held that fixed fines also may be considered purgable and civil when imposed and suspended pending future compliance. See also *Penfield*, 330 U. S., at 590 ("One who is fined, unless by a day certain he [complies,] has it in his power to avoid any penalty"); but see *Hicks*, 485 U. S., at 639,

and n. 11 (suspended or probationary sentence is criminal). *Mine Workers* involved a $3,500,000 fine imposed against the union for nationwide post-World War II strike activities. Finding that the determinate fine was both criminal and excessive, the Court reduced the sanction to a flat criminal fine of $700,000. The Court then imposed and suspended the remaining $2,800,000 as a coercive civil fine, conditioned on the union's ability to purge the fine through full, timely compliance with the trial court's order.[4] The Court concluded, in light of this purge clause, that the civil fine operated as "a coercive imposition upon the defendant union to compel obedience with the court's outstanding order." 330 U. S., at 307.

This Court has not revisited the issue of coercive civil contempt fines addressed in *Mine Workers*. Since that decision, the Court has erected substantial procedural protections in other areas of contempt law, such as criminal contempts, *e. g., Bloom* v. *Illinois*, 391 U. S. 194 (1968), and summary contempts, *e. g., Taylor* v. *Hayes*, 418 U. S. 488 (1974); *Codispoti* v. *Pennsylvania*, 418 U. S. 506, 513 (1974); *Johnson* v. *Mississippi*, 403 U. S. 212 (1971); *In re Oliver*, 333 U. S. 257, 275 (1948). Lower federal courts and state courts such as the trial court here nevertheless have relied on *Mine Workers* to authorize a relatively unlimited judicial power to impose noncompensatory civil contempt fines.

## B

Underlying the somewhat elusive distinction between civil and criminal contempt fines, and the ultimate question posed

---

[4] Although the size of the fine was substantial, the conduct required of the union to purge the suspended fine was relatively discrete. According to the Court, purgation consisted of (1) withdrawal of the union's notice terminating the Krug-Lewis labor agreement; (2) notifying the union members of this withdrawal; and (3) withdrawing and notifying the union members of the withdrawal of any other notice questioning the ongoing effectiveness of the Krug-Lewis agreement. *United States* v. *Mine Workers*, 330 U. S. 258, 305 (1947).

in this case, is what procedural protections are due before any particular contempt penalty may be imposed. Because civil contempt sanctions are viewed as nonpunitive and avoidable, fewer procedural protections for such sanctions have been required. To the extent that such contempts take on a punitive character, however, and are not justified by other considerations central to the contempt power, criminal procedural protections may be in order.

The traditional justification for the relative breadth of the contempt power has been necessity: Courts independently must be vested with "power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates, and . . . to preserve themselves and their officers from the approach and insults of pollution." *Anderson* v. *Dunn*, 6 Wheat. 204, 227 (1821). Courts thus have embraced an inherent contempt authority, see *Gompers*, 221 U. S., at 450; *Ex parte Robinson*, 19 Wall. 505, 510 (1874), as a power "necessary to the exercise of all others," *United States* v. *Hudson*, 7 Cranch 32, 34 (1812).

But the contempt power also uniquely is "'liable to abuse.'" *Bloom*, 391 U. S., at 202, quoting *Ex parte Terry*, 128 U. S. 289, 313 (1888). Unlike most areas of law, where a legislature defines both the sanctionable conduct and the penalty to be imposed, civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct. Contumacy "often strikes at the most vulnerable and human qualities of a judge's temperament," *Bloom*, 391 U. S., at 202, and its fusion of legislative, executive, and judicial powers "summons forth . . . the prospect of 'the most tyrannical licentiousness,'" *Young* v. *United States ex rel. Vuitton et Fils S. A.*, 481 U. S. 787, 822 (1987) (SCALIA, J., concurring in judgment), quoting *Anderson*, 6 Wheat., at 228. Accordingly, "in [criminal] contempt cases an even more compelling argument can be made [than in ordinary criminal cases] for providing

a right to jury trial as a protection against the arbitrary exercise of official power." *Bloom,* 391 U. S., at 202.

Our jurisprudence in the contempt area has attempted to balance the competing concerns of necessity and potential arbitrariness by allowing a relatively unencumbered contempt power when its exercise is most essential, and requiring progressively greater procedural protections when other considerations come into play. The necessity justification for the contempt authority is at its pinnacle, of course, where contumacious conduct threatens a court's immediate ability to conduct its proceedings, such as where a witness refuses to testify, or a party disrupts the court. See *Young,* 481 U. S., at 820–821 (SCALIA, J., concurring in judgment) (the judicial contempt power is a "power of self-defense," limited to sanctioning "those who interfere with the orderly conduct of [court] business or disobey orders necessary to the conduct of that business"). Thus, petty, direct contempts in the presence of the court traditionally have been subject to summary adjudication, "to maintain order in the courtroom and the integrity of the trial process in the face of an 'actual obstruction of justice.'" *Codispoti* v. *Pennsylvania,* 418 U. S., at 513, quoting *In re McConnell,* 370 U. S. 230, 236 (1962); cf. *United States* v. *Wilson,* 421 U. S. 309, 315–316 (1975); *Harris* v. *United States,* 382 U. S. 162, 164 (1965). In light of the court's substantial interest in rapidly coercing compliance and restoring order, and because the contempt's occurrence before the court reduces the need for extensive factfinding and the likelihood of an erroneous deprivation, summary proceedings have been tolerated.

Summary adjudication becomes less justifiable once a court leaves the realm of immediately sanctioned, petty direct contempts. If a court delays punishing a direct contempt until the completion of trial, for example, due process requires that the contemnor's rights to notice and a hearing be respected. *Taylor* v. *Hayes,* 418 U. S. 488 (1974). There "it is much more difficult to argue that action without notice

or hearing of any kind is necessary to preserve order and enable [the court] to proceed with its business," *id.*, at 498, particularly "in view of the heightened potential for abuse posed by the contempt power," *id.*, at 500; see also *Harris* v. *United States*, 382 U. S., at 164–165. Direct contempts also cannot be punished with serious criminal penalties absent the full protections of a criminal jury trial. *Bloom*, 391 U. S., at 210.

Still further procedural protections are afforded for contempts occurring out of court, where the considerations justifying expedited procedures do not pertain. Summary adjudication of indirect contempts is prohibited, *e. g., Cooke* v. *United States*, 267 U. S. 517, 534 (1925), and criminal contempt sanctions are entitled to full criminal process, *e. g., Hicks*, 485 U. S., at 632. Certain indirect contempts nevertheless are appropriate for imposition through civil proceedings. Contempts such as failure to comply with document discovery, for example, while occurring outside the court's presence, impede the court's ability to adjudicate the proceedings before it and thus touch upon the core justification for the contempt power. Courts traditionally have broad authority through means other than contempt—such as by striking pleadings, assessing costs, excluding evidence, and entering default judgment—to penalize a party's failure to comply with the rules of conduct governing the litigation process. See, *e. g.*, Fed. Rules Civ. Proc. 11, 37. Such judicial sanctions never have been considered criminal, and the imposition of civil, coercive fines to police the litigation process appears consistent with this authority. Similarly, indirect contempts involving discrete, readily ascertainable acts, such as turning over a key or payment of a judgment, properly may be adjudicated through civil proceedings since the need for extensive, impartial factfinding is less pressing.

For a discrete category of indirect contempts, however, civil procedural protections may be insufficient. Contempts involving out-of-court disobedience to complex injunctions

often require elaborate and reliable factfinding. Cf. *Green*
v. *United States*, 356 U. S. 165, 217, n. 33 (1958) (Black,
J., dissenting) ("Alleged contempts committed beyond the
court's presence where the judge has no personal knowledge
of the material facts are especially suited for trial by jury.
A hearing must be held, witnesses must be called, and evi-
dence taken in any event. And often . . . crucial facts are
in close dispute" (citation omitted)). Such contempts do not
obstruct the court's ability to adjudicate the proceedings be-
fore it, and the risk of erroneous deprivation from the lack
of a neutral factfinder may be substantial. *Id.*, at 214–215.
Under these circumstances, criminal procedural protections
such as the rights to counsel and proof beyond a reasonable
doubt are both necessary and appropriate to protect the due
process rights of parties and prevent the arbitrary exercise
of judicial power.

## C

In the instant case, neither any party nor any court of the
Commonwealth has suggested that the challenged fines are
compensatory. At no point did the trial court attempt to
calibrate the fines to damages caused by the union's contu-
macious activities or indicate that the fines were "to compen-
sate the complainant for losses sustained." *Mine Workers*,
330 U. S., at 303–304. The nonparty governments, in turn,
never requested any compensation or presented any evi-
dence regarding their injuries, never moved to intervene in
the suit, and never actively defended the fines imposed.
The issue before us accordingly is limited to whether these
fines, despite their noncompensatory character, are coercive
civil or criminal sanctions.

The parties propose two independent tests for determin-
ing whether the fines are civil or criminal. Petitioners
argue that because the injunction primarily prohibited cer-
tain conduct rather than mandated affirmative acts, the sanc-
tions are criminal. Respondents in turn urge that because
the trial court established a prospective fine schedule that

the union could avoid through compliance, the fines are civil in character.

Neither theory satisfactorily identifies those contempt fines that are criminal and thus must be imposed through the criminal process. Petitioners correctly note that *Gompers* suggests a possible dichotomy "between refusing to do an act commanded,—remedied by imprisonment until the party performs the required act; and doing an act forbidden,—punished by imprisonment for a definite term." 221 U. S., at 443. The distinction between mandatory and prohibitory orders is easily applied in the classic contempt scenario, where contempt sanctions are used to enforce orders compelling or forbidding a single, discrete act. In such cases, orders commanding an affirmative act simply designate those actions that are capable of being coerced.

But the distinction between coercion of affirmative acts and punishment of prohibited conduct is difficult to apply when conduct that can recur is involved, or when an injunction contains both mandatory and prohibitory provisions. Moreover, in borderline cases injunctive provisions containing essentially the same command can be phrased either in mandatory or prohibitory terms. Under a literal application of petitioners' theory, an injunction ordering the union: "Do not strike," would appear to be prohibitory and criminal, while an injunction ordering the union: "Continue working," would be mandatory and civil. See Tr. of Oral Arg. 8–9; Dobbs, Contempt of Court: A Survey, 56 Cornell L. Rev. 183, 239 (1971). In enforcing the present injunction, the trial court imposed fines without regard to the mandatory or prohibitory nature of the clause violated. Accordingly, even though a parsing of the injunction's various provisions might support the classification of contempts such as rock throwing and placing tire-damaging "jackrocks" on roads as criminal and the refusal to place supervisors at picket sites as civil, the parties have not asked us to review the order in that manner. In a case like this involving an injunction that pre-

scribes a detailed code of conduct, it is more appropriate to identify the character of the entire decree. Cf. *Hicks*, 485 U. S., at 638, n. 10 (internal quotation marks omitted) (Where both civil and criminal relief is imposed "the criminal feature of the order is dominant and fixes its character for purposes of review").

Despite respondents' urging, we also are not persuaded that dispositive significance should be accorded to the fact that the trial court prospectively announced the sanctions it would impose. Had the trial court simply levied the fines after finding the union guilty of contempt, the resulting "determinate and unconditional" fines would be considered "solely and exclusively punitive." *Id.*, at 632–633 (internal quotation marks omitted); see also *Penfield Co. of Cal.* v. *SEC*, 330 U. S. 585 (1947). Respondents nevertheless contend that the trial court's announcement of a prospective fine schedule allowed the union to "avoid paying the fine[s] simply by performing the . . . act required by the court's order," *Hicks*, 485 U. S., at 632, and thus transformed these fines into coercive, civil ones. Respondents maintain here, as the Virginia Supreme Court held below, that the trial court could have imposed a daily civil fine to coerce the union into compliance, and that a prospective fine schedule is indistinguishable from such a sanction.

Respondents' argument highlights the difficulties encountered in parsing coercive civil and criminal contempt fines. The fines imposed here concededly are difficult to distinguish either from determinate, punitive fines or from initially suspended, civil fines. Ultimately, however, the fact that the trial court announced the fines before the contumacy, rather than after the fact, does not in itself justify respondents' conclusion that the fines are civil or meaningfully distinguish these penalties from the ordinary criminal law. Due process traditionally requires that criminal laws provide prior notice both of the conduct to be prohibited and of the sanction to be imposed. The trial court here simply announced the pen-

alty—determinate fines of $20,000 or $100,000 per violation—that would be imposed for future contempts. The union's ability to avoid the contempt fines was indistinguishable from the ability of any ordinary citizen to avoid a criminal sanction by conforming his behavior to the law. The fines are not coercive day fines, or even suspended fines, but are more closely analogous to fixed, determinate, retrospective criminal fines which petitioners had no opportunity to purge once imposed. We therefore decline to conclude that the mere fact that the sanctions were announced in advance rendered them coercive and civil as a matter of constitutional law.

Other considerations convince us that the fines challenged here are criminal. The union's sanctionable conduct did not occur in the court's presence or otherwise implicate the court's ability to maintain order and adjudicate the proceedings before it. Nor did the union's contumacy involve simple, affirmative acts, such as the paradigmatic civil contempts examined in *Gompers*. Instead, the Virginia trial court levied contempt fines for widespread, ongoing, out-of-court violations of a complex injunction. In so doing, the court effectively policed petitioners' compliance with an entire code of conduct that the court itself had imposed. The union's contumacy lasted many months and spanned a substantial portion of the State. The fines assessed were serious, totaling over $52 million.[5] Under such circumstances,

---

[5] "[P]etty contempt like other petty criminal offenses may be tried without a jury," *Taylor* v. *Hayes*, 418 U. S. 488, 495 (1974), and the imposition only of serious criminal contempt fines triggers the right to jury trial. *Bloom*, 391 U. S., at 210. The Court to date has not specified what magnitude of contempt fine may constitute a serious criminal sanction, although it has held that a fine of $10,000 imposed on a union was insufficient to trigger the Sixth Amendment right to jury trial. See *Muniz* v. *Hoffman*, 422 U. S. 454, 477 (1975); see also 18 U. S. C. § 1(3) (1982 ed., Supp. V) (defining petty offenses as crimes "the penalty for which . . . does not exceed imprisonment for a period of six months or a fine of not more than $5,000 for an individual and $10,000 for a person other than an individual,

disinterested factfinding and evenhanded adjudication were essential, and petitioners were entitled to a criminal jury trial.

In reaching this conclusion, we recognize that this Court generally has deferred to a legislature's determination whether a sanction is civil or criminal, see, *e. g., United States* v. *Ward,* 448 U. S. 242, 248 (1980); *Helvering* v. *Mitchell,* 303 U. S. 391 (1938), and that "[w]hen a State's proceedings are involved, state law provides strong guidance about whether or not the State is exercising its authority 'in a nonpunitive, noncriminal manner.'" *Hicks,* 485 U. S., at 631, quoting *Allen* v. *Illinois,* 478 U. S. 364, 368 (1986). We do not deviate from either tradition today. Where a single judge, rather than a legislature, declares a particular sanction to be civil or criminal, such deference is less appropriate. Cf. *Madsen* v. *Women's Health Center, Inc., ante,* p. 753. Moreover, this Court has recognized that even for state proceedings, the label affixed to a contempt ultimately "will not be allowed to defeat the applicable protections of federal constitutional law." *Hicks* v. *Feiock,* 485 U. S., at 631. We conclude that the serious contempt fines imposed here were criminal and constitutionally could not be imposed absent a jury trial.

## III

Our decision concededly imposes some procedural burdens on courts' ability to sanction widespread, indirect contempts of complex injunctions through noncompensatory fines. Our holding, however, leaves unaltered the longstanding authority of judges to adjudicate direct contempts summarily, and to enter broad compensatory awards for all contempts through civil proceedings. See, *e. g., Sheet Metal Workers* v. *EEOC,* 478 U. S. 421 (1986). Because the right to trial by

or both") (repealed 1984). We need not answer today the difficult question where the line between petty and serious contempt fines should be drawn, since a $52 million fine unquestionably is a serious contempt sanction.

jury applies only to serious criminal sanctions, courts still may impose noncompensatory, petty fines for contempts such as the present ones without conducting a jury trial. We also do not disturb a court's ability to levy, albeit through the criminal contempt process, serious fines like those in this case.

Ultimately, whatever slight burden our holding may impose on the judicial contempt power cannot be controlling. The Court recognized more than a quarter century ago:

> "We cannot say that the need to further respect for judges and courts is entitled to more consideration than the interest of the individual not be subjected to serious criminal punishment without the benefit of all the procedural protections worked out carefully over the years and deemed fundamental to our system of justice. Genuine respect, which alone can lend true dignity to our judicial establishment, will be engendered, not by the fear of unlimited authority, but by the firm administration of the law through those institutionalized procedures which have been worked out over the centuries." *Bloom,* 391 U. S., at 208.

Where, as here, "a serious contempt is at issue, considerations of efficiency must give way to the more fundamental interest of ensuring the even-handed exercise of judicial power." *Id.,* at 209.

The judgment of the Supreme Court of Virginia is reversed.

*It is so ordered.*

JUSTICE SCALIA, concurring.

I join the Court's opinion classifying the $52 million in contempt fines levied against petitioners as criminal. As the Court's opinion demonstrates, our cases have employed a variety of not easily reconcilable tests for differentiating between civil and criminal contempts. Since all of those tests

would yield the same result here, there is no need to decide which is the correct one—and a case so extreme on its facts is not the best case in which to make that decision. I wish to suggest, however, that when we come to making it, a careful examination of historical practice will ultimately yield the answer.

That one and the same person should be able to make the rule, to adjudicate its violation, and to assess its penalty is out of accord with our usual notions of fairness and separation of powers. See *ante*, at 831; *Green* v. *United States*, 356 U. S. 165, 198–199 (1958) (Black, J., dissenting); cf. *Bloom* v. *Illinois*, 391 U. S. 194, 202 (1968); *Cooke* v. *United States*, 267 U. S. 517, 539 (1925). And it is worse still for that person to conduct the adjudication without affording the protections usually given in criminal trials. Only the clearest of historical practice could establish that such a departure from the procedures that the Constitution normally requires is not a denial of due process of law. See *Burnham* v. *Superior Court of Cal., County of Marin*, 495 U. S. 604, 623–625 (1990); cf. *Honda Motor Co.* v. *Oberg, ante*, at 430–431.

At common law, contempts were divided into criminal contempts, in which a litigant was punished for an affront to the court by a fixed fine or period of incarceration; and civil contempts, in which an uncooperative litigant was incarcerated (and, in later cases, fined*) until he complied with a specific order of the court. See *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418, 441–444 (1911). Incarceration until compliance was a distinctive sanction, and sheds light upon the nature of the decrees enforced by civil contempt. That sanction makes sense only if the order requires performance

---

*The per diem fines that came to be used to coerce compliance with decrees were in most relevant respects like conditional prison terms. With them, as with incarceration, the penalty continued until the contemnor complied, and compliance stopped any further punishment but of course did not eliminate or restore any punishment already endured.

of an identifiable act (or perhaps cessation of continuing performance of an identifiable act). A general prohibition for the future does not lend itself to enforcement through conditional incarceration, since no single act (or the cessation of no single act) can demonstrate compliance and justify release. One court has expressed the difference between criminal and civil contempts as follows: "Punishment in criminal contempt cannot undo or remedy the thing which has been done, but in civil contempt punishment remedies the disobedience." *In re Fox*, 96 F. 2d 23, 25 (CA3 1938).

As one would expect from this, the orders that underlay civil contempt fines or incarceration were usually mandatory rather than prohibitory, see *Gompers, supra*, at 442, directing litigants to perform acts that would further the litigation (for example, turning over a document), or give effect to the court's judgment (for example, executing a deed of conveyance). The latter category of order was particularly common, since the jurisdiction of equity courts was generally *in personam* rather than *in rem*, and the relief they decreed would almost always be a directive to an individual to perform an act with regard to property at issue. See 4 J. Pomeroy, Equity Jurisprudence § 1433, pp. 3386–3388 (4th ed. 1919). The mandatory injunctions issued upon termination of litigation usually required "a single simple act." H. McClintock, Principles of Equity § 15, pp. 32–33 (2d ed. 1948). Indeed, there was a "historical prejudice of the court of chancery against rendering decrees which called for more than a single affirmative act." *Id.*, § 61, at 160. And where specific performance of contracts was sought, it was the categorical rule that no decree would issue that required ongoing supervision. See, *e. g., Marble Co.* v. *Ripley*, 10 Wall. 339, 358–359 (1870); see also McClintock, *supra*, § 61, at 160–161; 1 J. Story, Commentaries on Equity Jurisprudence § 778b, p. 782 (Redfield ed.; 10th ed. 1870). Compliance with these "single act" mandates could, in addition to being simple, be

quick; and once it was achieved the contemnor's relationship with the court came to an end, at least insofar as the subject of the order was concerned. Once the document was turned over or the land conveyed, the litigant's obligation to the court, and the court's coercive power over the litigant, ceased. See *United States* v. *Mine Workers*, 330 U. S. 258, 332 (1947) (Black, J., concurring in part and dissenting in part). The court did not engage in any ongoing supervision of the litigant's conduct, nor did its order continue to regulate his behavior.

Even equitable decrees that were prohibitory rather than mandatory were, in earlier times, much less sweeping than their modern counterparts. Prior to the labor injunctions of the late 1800's, injunctions were issued primarily in relatively narrow disputes over property. See, *e. g.,* W. Kerr, Law and Practice of Injunctions *7 (2d Am. Ed. 1880); see also F. Frankfurter & N. Greene, The Labor Injunction 23–24, 87–88 (1930).

Contemporary courts have abandoned these earlier limitations upon the scope of their mandatory and injunctive decrees. See G. McDowell, Equity and the Constitution 4, 9 (1982). They routinely issue complex decrees which involve them in extended disputes and place them in continuing supervisory roles over parties and institutions. See, *e. g., Missouri* v. *Jenkins*, 495 U. S. 33, 56–58 (1990); *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.,* 402 U. S. 1, 16 (1971). Professor Chayes has described the extent of the transformation:

> "[The modern decree] differs in almost every relevant characteristic from relief in the traditional model of adjudication, not the least in that it *is* the centerpiece. . . . It provides for a complex, on-going regime of performance rather than a simple, one-shot, one-way transfer. Finally, it prolongs and deepens, rather than terminates, the court's involvement with the dispute." Chayes, The

Role of the Judge in Public Law Litigation, 89 Harv. L. Rev. 1281, 1298 (1976).

The consequences of this change for the point under discussion here are obvious: When an order governs many aspects of a litigant's activities, rather than just a discrete act, determining compliance becomes much more difficult. Credibility issues arise, for which the factfinding protections of the criminal law (including jury trial) become much more important. And when continuing prohibitions or obligations are imposed, the order cannot be complied with (and the contempt "purged") in a single act; it continues to govern the party's behavior, on pain of punishment—not unlike the criminal law.

The order at issue here provides a relatively tame example of the modern, complex decree. The amended injunction prohibited, *inter alia*, rock throwing, the puncturing of tires, threatening, following or interfering with respondents' employees, placing pickets in other than specified locations, and roving picketing; and it required, *inter alia*, that petitioners provide a list of names of designated supervisors. App. to Pet. for Cert. 113a–116a. Although it would seem quite in accord with historical practice to enforce, by conditional incarceration or per diem fines, compliance with the last provision—a discrete command, observance of which is readily ascertained—using that same means to enforce the remainder of the order would be a novelty.

\* \* \*

The use of a civil process for contempt sanctions "makes no sense except as a consequence of historical practice." *Weiss* v. *United States*, 510 U. S. 163, 198 (1994) (SCALIA, J., concurring in part and concurring in judgment). As the scope of injunctions has expanded, they have lost some of the distinctive features that made enforcement through civil process acceptable. It is not that the times, or our perceptions of fairness, have changed (that is in my view no basis

for either tightening or relaxing the traditional demands of due process); but rather that the modern judicial order is in its relevant essentials not the same device that in former times could always be enforced by civil contempt. So adjustments will have to be made. We will have to decide at some point which modern injunctions sufficiently resemble their historical namesakes to warrant the same extraordinary means of enforcement. We need not draw that line in the present case, and so I am content to join the opinion of the Court.

JUSTICE GINSBURG, with whom THE CHIEF JUSTICE joins, concurring in part and concurring in the judgment.

The issue in this case is whether the contempt proceedings brought against the petitioner unions are to be classified as "civil" or "criminal." As the Court explains, if those proceedings were "criminal," then the unions were entitled under our precedents to a jury trial, and the disputed fines, imposed in bench proceedings, could not stand. See *ante*, at 826–827.

I

*Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418 (1911), as the Court notes, see *ante*, at 827–828, is a pathmarking case in this area. The civil contempt sanction, *Gompers* instructs, is designed "to coerce the defendant to do the thing required by the order for the benefit of the complainant," rather than "to vindicate the authority of the law." 221 U. S., at 442. The sanction operates coercively because it applies continuously until the defendant performs the discrete, "affirmative act" required by the court's order, for example, production of a document or presentation of testimony. *Ibid.* The civil contemnor thus " 'carries the keys of his prison in his own pocket' ": At any moment, "[h]e can end the sentence and discharge himself . . . by doing what he had previously refused to do." *Ibid.*, quoting *In re Nevitt*, 117 F. 448, 461 (CA8 1902).

The criminal contempt sanction, by contrast, is "punitive, [imposed] to vindicate the authority of the court." *Gompers*, 221 U. S., at 441. Unlike the civil contemnor, who has refused to perform some discrete, affirmative act commanded by the court, *Gompers* explains, the criminal contemnor has "do[ne] that which he has been commanded not to do." *Id.*, at 442. The criminal contemnor's disobedience is past, a "completed act," *id.*, at 443, a deed no sanction can undo. See *id.*, at 442. Accordingly, the criminal contempt sanction operates not to coerce a future act from the defendant for the benefit of the complainant, but to uphold the dignity of the law, by punishing the contemnor's disobedience. *Id.*, at 442–443. Because the criminal contempt sanction is determinate and unconditional, the Court said in *Gompers*, "the defendant is furnished no key, and he cannot shorten the term by promising not to repeat the offense." *Id.*, at 442.

Even as it outlined these civil and criminal contempt prototypes, however, the Court in *Gompers* acknowledged that the categories, when filled by actual cases, are not altogether neat and tidy. Civil contempt proceedings, although primarily remedial, also "vindicat[e] . . . the court's authority"; and criminal contempt proceedings, although designed "to vindicate the authority of the law," may bestow "some incidental benefit" upon the complainant, because "such punishment tends to prevent a repetition of the disobedience." *Id.*, at 443.

II

The classifications described in *Gompers* have come under strong criticism, particularly from scholars. Many have observed, as did the Court in *Gompers* itself, that the categories, "civil" and "criminal" contempt, are unstable in theory and problematic in practice. See *ante*, at 827, n. 3 (citing scholarly criticism); see also Dudley, Getting Beyond the Civil/Criminal Distinction: A New Approach to the Regulation of Indirect Contempts, 79 Va. L. Rev. 1025, 1025, n. 1 (1993) (citing additional scholarly criticism).

Our cases, however, have consistently resorted to the distinction between criminal and civil contempt to determine whether certain constitutional protections, required in criminal prosecutions, apply in contempt proceedings. See, *e. g.*, *United States* v. *Dixon*, 509 U. S. 688, 696 (1993) ("We have held that [certain] constitutional protections for criminal defendants . . . apply in nonsummary criminal contempt prosecutions just as they do in other criminal prosecutions.") (citing cases). And the Court has repeatedly relied upon *Gompers'* delineation of the distinction between criminal and civil contempt. See, *e. g.*, *Hicks* v. *Feiock*, 485 U. S. 624, 631–633, 635–636 (1988). The parties, accordingly, have presented their arguments within the *Gompers* framework.

Two considerations persuade me that the contempt proceedings in this case should be classified as "criminal" rather than "civil." First, were we to accept the logic of Bagwell's argument that the fines here were civil, because "conditional" and "coercive," no fine would elude that categorization. The fines in this case were "conditional," Bagwell says, because they would not have been imposed if the unions had complied with the injunction. The fines would have been "conditional" in this sense, however, even if the court had not supplemented the injunction with its fines schedule; indeed, any fine is "conditional" upon compliance or noncompliance before its imposition. Cf. *ante*, at 837 (the unions' ability to avoid imposition of the fines was "indistinguishable from the ability of any ordinary citizen to avoid a criminal sanction by conforming his behavior to the law"). Furthermore, while the fines were "coercive," in the sense that one of their purposes was to encourage union compliance with the injunction, criminal contempt sanctions may also "coerce" in this same sense, for they, too, "ten[d] to prevent a repetition of the disobedience." *Gompers*, 221 U. S., at 443. Bagwell's thesis that the fines were civil, because "condi-

tional" and "coercive," would so broaden the compass of those terms that their line-drawing function would be lost.*

Second, the Virginia courts' refusal to vacate the fines, despite the parties' settlement and joint motion, see *ante*, at 825–826, is characteristic of criminal, not civil, proceedings. In explaining why the fines outlived the underlying civil dispute, the Supreme Court of Virginia stated: "Courts of the Commonwealth must have the authority to enforce their orders by employing coercive, civil sanctions if the dignity of the law and public respect for the judiciary are to be maintained." 244 Va. 463, 478, 423 S. E. 2d 349, 358 (1992). The Virginia court's references to upholding public authority and maintaining "the dignity of the law" reflect the very purposes *Gompers* ranked on the criminal contempt side. See *supra*, at 844–845. Moreover, with the private complainant gone from the scene, and an official appointed by the Commonwealth to collect the fines for the Commonwealth's coffers, it is implausible to invoke the justification of benefiting the civil complainant. The Commonwealth here pursues the fines on its own account, not as the agent of a private party, and without tying the exactions exclusively to a claim for compensation. Cf. *Hicks*, 485 U. S., at 632 ("[A] fine . . . [is] punitive when it is paid to the court," but "remedial" or "civil" "when the defendant can avoid paying the fine simply by performing the affirmative act required by the court's order."). If, as the trial court declared, the proceedings

---

*Bagwell further likens the prospective fines schedule to the civil contempt fine imposed in *United States* v. *Mine Workers*, 330 U. S. 258 (1947). In that case, however, the contemnor union was given an opportunity, after the fine was imposed, to avoid the fine by "effect[ing] full compliance" with the injunction. As the Court explains, see *ante*, at 830, n. 4, for purposes of allowing the union to avoid the fine, "full compliance" with the broad no-strike injunction, see 330 U. S., at 266, n. 12, was reduced to the performance of three affirmative acts. This opportunity to purge, consistent with the civil contempt scenario described in *Gompers*, see *supra*, at 844, was unavailable to the unions in this case.

were indeed civil from the outset, then the court should have granted the parties' motions to vacate the fines.

\* \* \*

Concluding that the fines at issue "are more closely analogous to . . . criminal fines" than to civil fines, *ante*, at 837, I join the Court's judgment and all but Part II–B of its opinion.