In re ASPEN LIMOUSINE SERVICES, INC., d/b/a Vans To Vail, Inc., and Vans To Breckenridge, Inc., a Colorado corporation, EIN 84–1071124, Debtor.

Bankruptcy No. 95–14489–SBB.

United States Bankruptcy Court, D. Colorado.

Dec. 20, 1995.

Bonnie A. Bell, Katch, Sender & Wasserman, P.C., Denver, CO, for Aspen Limousine Services, Inc.

Thomas F. Quinn, Jones & Keller, P.C., Denver, CO, for Colorado Mountain Express, Inc.

Tom Connolly, Boulder, CO, for Unsecured Creditors' Committee.

Edward Ramey, Isaacson, Rosenbaum, Woods & Levy, P.C., Denver, CO, for Airport Shuttle Colorado.

Leo Weiss, U.S. Trustee's Office, Denver, CO, for United States Trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW: ORDER OF CONTEMPT

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER comes before the Court on the Motion of Aspen Limousine Service for an Order to Show Cause Why Colorado Mountain Express Should Not Be Held in Contempt of Court filed September 25, 1995. The Court, having reviewed the file, conduct-

ed a hearing on December 6, 1995, and being otherwise duly advised in the premises,

DOES FIND AND CONCLUDE as set forth hereinafter.

1. The Debtor, Aspen Limousine Services, Inc. ("ALS"), requests that this Court find creditor and business competitor Colorado Mountain Express ("CME") in contempt of Court for its alleged violation of the rules and procedures of post-petition disclosure and solicitation of ballots under 11 U.S.C. § 1125(b). ALS alleges that CME violated the following statutory provisions which prohibit solicitation of ballots accepting a proposed plan of reorganization:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case ... unless, at the time of or before such solicitation, there is transmitted to such holder the plan ... and a written disclosure statement approved, after notice and hearing....

11 U.S.C. § 1125(b).

2. The Court held a hearing on this issue at which time it heard argument and received documents from ALS, CME, counsel for the Plan Co–Proponent Airport Shuttle Service of Colorado ("ASC"), counsel for the Unsecured Creditors' Committee (the "Committee"), and the Office of the United States Trustee.

3. The Movant, ALS, supported by the Committee and ASC, maintains, generally, that CME solicited acceptances of CME's proposed plan of reorganization by way of correspondence transmitted to approximately 13 of ALS' creditors on September 19, 1995.[1] That correspondence, Exhibit B to the instant Motion, and the transcript of this Court's hearing and ruling on September 14, 1995, Exhibit A to the instant Motion, constitute the two principal items of written material on which ALS bases its claims and on which this Court relies with respect to this decision.

4. The issue before this Court is part of and emanates from disputes and Court hearings involving ALS' election to be treated as a small business corporation and qualification to receive expedited treatment under new

provisions of the Bankruptcy Code, 11 U.S.C. §§ 1121(e) and 1125(f). With regard to administration of the within Chapter 11 case and confirmation of the Debtor's Plan of Reorganization as a small business corporation—all of which serves as the predicate and framework for the within dispute—this Court references and incorporates herein its opinion *In re Aspen Limousine Service, Inc.,* 187 B.R. 989 (Bankr.D.Colo.1995).

5. On September 14, 1995, this Court issued a ruling from the bench denying, in part, and granting, in part, CME's "Motion for Forthwith Conditional Approval of Creditor's Disclosure Statement and Ballot." That decision provided, *inter alia,* that CME's disclosure statement would not, then, be conditionally approved pursuant to 11 U.S.C. § 1125(f), but that this Court would set a hearing and deal with CME's motion on an accelerated basis. Pursuant to the transcript, the Court stated on September 14, 1995, in pertinent part, that:

> Two, the Court will set a hearing date for a status conference and a hearing on the adequacy of CME's disclosure statement for Tuesday at 1:30 in the afternoon on September 26th, Tuesday, September 26th. That is one day after the debtor is to have received all objections to its plan, all objections to its disclosure statement and ballots.
>
> . . . .
>
> Third, we will then hold a hearing on CME's pending disclosure statement if a new one was filed by CME, or if necessary, we will deal with the one that is presently before the Court.
>
> We will, fourth, at that hearing consider CME's pending motion for conditional approval of the disclosure statement and to allow consideration—solicitation of acceptances and rejections on its plan and disclosure statement.
>
> Five, the Court expressly reserves the right to not conditionally approve CME's disclosure statement and allow solicitation of its plan at the September 26th hearing, but it may do so if conditions are right and

---

1. Of approximately 200 creditors.

CME continues its alternative plan and disclosure statement.

Now, it's recognized that the orders of the Court appear to be a little inconsistent or some who don't like it might say it's a little schizophrenic. Let me explain to you the objective that I'm at least trying to achieve.

First, I want to give the debtor in possession its opportunity to quickly get a timely filed plan confirmed in a cost efficient manner without undue and complicating factors like a competing plan before the Court concurrently with its own.

September 14, 1995 hearing transcript, p. 12–13.

6. Approximately five days after this Court's September 14, 1995 Order and six days prior to the date set for the hearing on the adequacy of CME's disclosure statement, relating to its competing plan of reorganization, CME sent to selected creditors (a) its September 19, 1995 correspondence with (b) an attached seven-page Memorandum, the first page of which was entitled *"ABOUT THE CME PLAN ..."* (hereinafter "Written Solicitation").

■ 7. The Court has carefully examined CME's September 19, 1995 Written Solicitation. The Court concludes that certain portions of the Written Solicitation can fairly and easily be construed as a **solicitation in favor of CME's pending plan of reorganization, not merely a solicitation against the Debtor's pending Plan.** The Court basically concludes that while the tone and content of the Written Solicitation are generally framed as a statement in opposition to the Debtor's Plan of Reorganization—an effort to solicit rejections of the Debtor's pending Plan—certain, substantial portions of the Written Solicitation, in actuality, constitute **a solicitation for acceptances of the filed, then pending, competing plan of CME.**[2]

8. Those portions of the Written Solicitation which the Court believes are, essentially, solicitations in favor CME's competing plan of reorganization include the following:

**You have another option that represents a superior alternative.** Colorado Mountain Express, Inc. ("CME") has submitted a competing Disclosure Statement and Plan of Reorganization to the bankruptcy Court which is designed to pay you 100% of all the money owed only 20 days after the Judge approves the plan. Under the ALS/ASC Plan, you will have to wait months to receive your first installment and at least three years for full repayment.

. . . .

After reading the attached, I am certain you will choose to **VOTE *NO* ON THE ALS/ASC PLAN.** The facts are overwhelmingly in favor of the CME Plan, and you should demand a choice in the matter. Tell the Judge you want a choice by Voting No to the ALS/ASC Plan.

. . . .

CME filed a competing Disclosure Statement & Plan of Reorganization on September 5th. The competing plan was filed only one week after the Judge ruled that competing plans could be considered by the Court.

. . . .

The CME Plan is superior in all material respects, the most notable being the CME Plan is designed to pay creditors 100% only 20 days after the Judge approves our plan, with no strings attached.

. . . .

The CME Plan is scheduled to be considered by the Judge at a hearing on September 26th. If objections to the ALS/ASC plan are filed by creditors, or if enough creditors vote NO to the ALS/ASC Plan, then it is likely the Judge would allow the CME plan to be distributed for consideration by the creditors and a vote. The Judge has clearly granted ALS/ASC an advantage in the bankruptcy proceedings by not allowing the CME Plan to be dis-

---

2. This Court recognizes that CME made the following disclaimer: "We are not asking for your vote in favor of the CME Plan at this time—your acceptance of the CME Plan will only be sought after full disclosure of the facts and terms of the CME Plan have been approved." This Court, however, finds that, on balance, such a statement does not fully and satisfactorily negate the overall message and tone of CME's Written Solicitation. It is construed to be more in the nature of "cover," or an effort to soften an outright solicitation in favor of CME's plan.

tributed for parallel consideration by the creditors, even though the CME Plan treats creditors more favorably. **We are not asking for your vote in favor of the CME Plan at this time—your acceptance of the CME Plan will only be sought after full disclosure of the facts and terms of the CME Plan have been approved.**

By voting NO for the ALS/ASC Plan, you will send a clear message to the Judge that you want to have the CME Plan distributed to creditors as an alternative to the ALS/ASC Plan.

9. Exhibit A to the subject Memorandum, *"ABOUT THE CME PLAN ...,"* consists of columnar tabulations and a favorable comparison of certain cash distributions under the CME plan over the ALS/ASC Plan.

10. A later portion of the Memorandum, delineated *"WHAT ARE CME'S INTENTIONS,"* provided as follows:

CME intends to acquire ALS' assets pursuant to its competing Plan of Reorganization. Because we feel that we have been disadvantaged by the Judge's decision to disallow the distribution of the CME Plan for consideration by the creditors, we intend to pursue every legal remedy available to forestall the ALS/ASC Plan should it receive confirmation. We are not going away!

Should CME prevail in its efforts to acquire the assets of ALS, numerous employment opportunities will be available to the existing employees of Hospitality Enterprises. CME is an equal opportunity employer and will entertain applications, if they are submitted, for employment by CME. CME generally pays more to its employees than its competitors and offers numerous benefits, including health, disability and dental insurance, paid time off, and a 401(k) retirement program, and which may be of interest to all applicants, including present ALS/Hospitality Enterprises employees.

With respect to vendors, CME already does business with a number of Aspen Limousine's vendors. In addition, given the expected increase in our volume; CME will be looking to expand its existing base of vendors and begin doing business with other vendors. There will be lots of opportunities for ALS's creditors to continue their existing business relationships with CME. We believe that a business relationship with CME versus ALS makes good business sense, given the fact that Aspen Limousine is experiencing substantial financial difficulties.

■ 11. With regard to contempt proceedings, this Court must examine the circumstances surrounding the issuance of a contempt order to determine whether the intent of the issuing court was to "satisfy a judgment or simply to punish." *International Distribution Centers, Inc. v. Walsh Trucking Co., Inc.,* 62 B.R. 723, 729 (S.D.N.Y. 1986). *See, generally, International Union, United Mine Workers of America v. Bagwell,* —— U.S. ——, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994); *In re Steele Cattle, Inc.,* 39 F.3d 1192, 1994 WL 596627 (10th Cir.1994) (table, text in Westlaw).

■ 12. Generally, the nature of the proceedings must be determined by the character and dominant purpose of the relief sought. Civil and criminal contempt may be distinguished as follows:

[c]ivil contempt is remedial; the penalty serves to enforce compliance with a court order or to compensate an injured party. Criminal contempt is punitive; the penalty serves to vindicate the authority of the court and does not terminate upon compliance with a court order.

*In re Stewart,* 571 F.2d 958, 963 (5th Cir. 1978).

13. The Tenth Circuit Court of Appeals has concluded that bankruptcy courts have statutory authority to exercise contempt powers, at least civil contempt powers, if not criminal contempt powers, as well. *In re Skinner,* 917 F.2d 444 (10th Cir.1990).

14. "In *Skinner* we were called upon to determine whether bankruptcy courts have jurisdiction to enter sanctions against a party for civil contempt. In holding the bankruptcy court does have the statutory power under 11 U.S.C. § 105 to enter monetary sanctions for civil contempt we found, as we do here, no reason to read into the statute anything

other than its plain meaning. *Skinner,* 917 F.2d at 447." *O'Connor v. U.S. Dep't of Energy,* 942 F.2d 771 (10th Cir.1991).

15. The issue of bankruptcy court jurisdiction in the area of criminal contempt is not resolved with clarity or certainty, however, the Eighth Circuit has determined that bankruptcy courts do have criminal contempt powers. *In re Ragar,* 3 F.3d 1174 (8th Cir. 1993).

■ 16. The leading and most current Supreme Court case on this issue, *International Union, United Mine Workers of America v. Bagwell, supra,* establishes, once again, that deciding what is civil contempt and criminal contempt is a sometimes fact intensive and difficult determination. That decision, classifying a seemingly civil contempt as, in reality, a criminal contempt, emphasizes that the circumstances must be closely examined to properly treat an allegation of contempt.

17. Several factors seem significant in the court's decision in *Bagwell.* First, the underlying injunction was complicated and contained both prohibitions and mandates. Second, the amount of the sanctions was great and possibly indicative of abuse, especially since the sanctioned conduct occurred over several months. Third, the nature of the contumacious conduct required extensive factfinding. Finally, the parties did not allege that the fines were compensatory or submit evidence which would support a finding that they were compensatory. In the instant case, there are few of these features and when present, they are not extreme, substantial or evident.

18. However, the *Bagwell* decision specifically recognized courts' traditional powers to summarily adjudicate "petty direct contempts in the presence of the court . . . 'to maintain order in the courtroom and the integrity of the trial process in the face of an "actual obstruction of justice.' " *Bagwell, supra.* This observation is not entirely inappropriate in this instant circumstance and may, indeed, be rather instructive to a violation of solicitation provisions under the Code.

■ 19. In either event of criminal or civil contempt, a bankruptcy court's decision in contempt is fully and unqualifiedly subject to due process requirements and, certainly for criminal contempt, that entails full compliance with and procedure under Rules 9020 and 9033, Fed.R.Bankr.P.

Rule 9033 appears to provide the review framework for all contempt orders. In fact, de novo review under Rule 9033(d) by an Article III court may be required to preserve the constitutionality of a bankruptcy court's contempt power. [Citation omitted.]

*Steele Cattle, supra.*[3]

3. The Honorable John L. Kane, Jr., stated:

In my September 4, 1991 Memorandum Opinion and Order, I determined Bankruptcy Rule 9033(d) governed my review of the contempt orders at issue.[FN7]

[FN7]. This was based on the bankruptcy court's concern over the uncertainty in the law regarding whether contempt actions were "core" proceedings under 28 U.S.C. § 157(b)(2) and thus subject to final determination and judgment by the bankruptcy court, or whether they were "non-core" proceedings under § 157(c)(1) susceptible to judgment only by the district court after de novo review. After a thorough analysis of the applicable law, the bankruptcy court determined it was bound to resolve the matter as a non-core proceeding subject to review under Rule 9033. [Citations omitted.] I agree with the bankruptcy court that while the issue is far from clear, both *Skinner* and *Granfinanciera v. Nordberg,* 492 U.S. 33, 54–58, 109 S.Ct. 2782, 2797–99, 106 L.Ed.2d 26 (1989) suggest that in enacting 11 U.S.C.

§ 105(a), Congress intended to authorize bankruptcy judges to adjudicate civil contempt proceedings to final judgment. *See In re Courtesy Inns, Ltd., Inc.,* 40 F.3d 1084, 1089 (10th Cir.1994) (§ 105 imbued bankruptcy courts with the inherent power recognized by the Supreme Court in *Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) to sanction conduct abusive of the judicial process). I note that in *Skinner,* the Tenth Circuit concluded that "[c]ivil contempt proceedings arising out of core matters are themselves core matters." [Citation omitted.] The matters out of which the Winslows' contempt here arose were "core" matters on which the bankruptcy court may enter judgment. Resolution of the "core"/"non-core" question, however, is left for another day, and I will review the contempt orders at issue in accordance with Rule 9033.

*In re Winslow,* 186 B.R. 716, 720–721 (D.Colo. 1995).

20. Violation of the solicitation provisions of 11 U.S.C. § 1125 appear to have no specific enforcement or remedial provisions in the Code, except, perhaps, 11 U.S.C. § 1126(e). This putative "remedy"—disqualification of affected ballots—is essentially no remedy at all, particularly under the within circumstances where the Debtor's primary Plan was confirmed quickly and early in the Chapter 11 process, as provided under the expedited procedures for small businesses.

21. This Court concludes that the conduct of CME in soliciting votes in favor of its plan was in violation of 11 U.S.C. § 1125(b).

22. A sanction herein shall be imposed against CME in order to:

(a) vindicate the dignity of the Court

(b) penalize CME for its violation of the solicitation prohibition of 11 U.S.C. § 1125(b),

(c) protect the integrity of, and maintain respect for, the solicitation and balloting procedures under the Code, and

(d) establish precedent that compliance with the confirmation provisions of the Code is mandatory, or Court approval to abrogate those provisions is necessary, the Court will impose a sanction against CME.

23. This sanction is imposed with full appreciation that applicable law does **not** prohibit all communications to creditors that are not previously approved by the Court. Indeed, the Bankruptcy Code "never limits the facts which a creditor may receive, but only the time when a creditor may be solicited." *Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 100 (3d Cir.1988). The term solicitation must be read narrowly. *Century Glove, supra* at 101. ("A broad reading of § 1125 can seriously inhibit free creditor negotiations.")

24. CME should not be barred from honestly negotiating with other creditors about its plan, so long as it does not solicit acceptances of the plan, since "[t]he ability of a creditor to compare the debtor's proposals against other possibilities is a powerful tool by which to judge the reasonableness of the proposals." *Century Glove, supra* at 102. However, here, CME exceeded its rights; it

went over the line and affirmatively, aggressively, and cavalierly solicited support for its own plan, not merely rejections of the Debtor's Plan.

25. This sanction is also imposed mindful of, but disagreeing with, the United States Trustee in this matter. This Court has difficulty concurring in the argument advanced by the U.S. Trustee's Office that there was, in the instant case, essentially "no harm—no foul." Violation of the solicitation provisions of the Bankruptcy Code, which can cause substantial damage and inestimable benefit to a competing plan proponent, is not, as the U.S. Trustee's Office claimed, a "mere trifle." The integrity of the Bankruptcy Code and the requirement that parties play within certain boundaries in order to have the confirmation process predictable, fair and efficient is paramount. Those goals are too important to be ignored or avoided by the Court.

26. The Court will recommend and hereby impose a modest and measured sanction against CME consisting of:

(a) reimbursement of attorney's fees, or other Debtor's costs, which were incurred by the Debtor as a direct and necessary consequence of CME's improper solicitation, and

(b) a sanction of $1,000.00 payable to the Court. Both sanctions are payable within ten (10) days after this Order becomes final and non-appealable.

27. Pursuant to Rule 9020(c), Fed. R.Bankr.P., this shall constitute Findings of Fact and Conclusions of Law as to the contempt by CME and shall be effective ten (10) days after service of this Order unless CME, within ten (10) days, serves and files objections in the manner provided in Rule 9033(b), Fed.R.Bankr.P.

For the reasons set forth above, it is

ORDERED that the Clerk of the Bankruptcy Court shall docket and serve the within Findings of Fact and Conclusions of Law: Order of Contempt on all parties-in-interest.

IT IS FURTHER ORDERED that Colorado Mountain Express shall be responsible for and pay (a) to the Debtor attorney's fees,

or other Debtor's costs, which were incurred by the Debtor as a direct and necessary consequence of CME's improper solicitation, and (b) to the Court, a sanction of $1,000.00.

IT IS FURTHER ORDERED that both sanctions are payable within ten (10) days after this Order becomes final and non-appealable.