JOURNAL ENTRY AND OPINION
Defendants Michael Kahoe and Timothy Cherotti were employees of Tradesmen International ("Tradesmen"), a company that leases skilled tradespeople to construction contractors, among others. Both defendants signed noncompetition and trade secrets agreements as part of their employment. When defendants left Tradesmen's employ, they started their own business in direct contravention of the noncompetition agreements. Tradesmen sought an injunction to prohibit defendants from continuing in business and, in a consent decree, the parties ultimately agreed that the court would issue an injunction and defendants would abide by their noncompetition agreements beginning on January 3, 1997 and running for six months.
Tradesmen later learned that both defendants had started a new company called Electricians Unlimited ("EU") that directly competed against it by leasing electricians. Defendants started this new company before the expiration of the noncompetition agreements as set forth in the consent decree. Tradesmen filed a motion to show cause why defendants should not be held in contempt for failing to abide by the consent decree. The court conducted a hearing and found both defendants in contempt. It ordered defendants to sever all ties to customers it lured away from Tradesmen, extended the noncompetition agreements for an additional six months, restrained each defendant from entering into contracts with the other or their intermediaries to operate any business enterprise coming within the reach of the noncompetition agreements, and awarded Tradesmen $51,459.78 in uncontested attorney fees. Defendants appeal and contest all parts of the court's contempt citation.
 I
The first assignment of error complains that Tradesmen failed to carry its burden of proving by clear and convincing evidence the defendants violated the trial court's injunction and consent decree.
 A
Throughout the proceedings in the lower court, the parties and the court assumed that the contempt flowing from the violation of the consent decree was civil, not criminal. However, a question has subsequently arisen whether the contempt is, in fact, criminal. This is an important distinction, for if the contempt were criminal in nature, the burden of persuasion would become proof beyond a reasonable doubt, see Brown v. Executive 200, Inc.
(1980), 64 Ohio St.2d 250, syllabus, a standard that admittedly would not be met in this case.
The distinction between civil and criminal contempt is not always apparent, and even the United States Supreme Court has stated, "[a]lthough the procedural contours of the two forms of contempt are well established, the distinguishing characteristics of civil versus criminal contempts are somewhat less clear."International Union, United Mine Workers of America v. Bagwell
(1994), 512 U.S. 821, 828. Because the distinction is not clear, the courts should exercise caution in overturning the assumptions of parties who make no argument that a contempt proceeding is anything but civil in nature. This is not to say that the courts should never question the true nature of contempt proceedings. It is always the duty of a court to see that substantial justice is done. But when neither party raises the issue during the contempt proceedings, and the contemnor fails to raise the issue on appeal., an appellate court should not raise the issue on its own initiative. For all practical purposes, we must consider the matter waived.
The preceding discussion presupposes there is a colorable claim that the contempt proceedings below were criminal in nature. The facts do not support this presupposition. The court's order extending the terms of the noncompetition agreements for an additional six month period is a classic example of civil contempt sanction serving to coerce the defendant into compliance with the court's order.
In Brown v. Executive 200, Inc., the Ohio Supreme Court stated:
 While both types of contempt contain an element of punishment, courts distinguish criminal and civil contempt not on the basis of punishment, but rather, by the character and purpose of the punishment. Punishment is remedial or coercive and for the benefit of the complainant in civil contempt. Prison sentences are conditional. The contemnor is said to carry the keys of his prison in his own pocket since he will be freed if he agrees to do as ordered. Criminal contempt, on the other hand, is usually characterized by an unconditional prison sentence. Such imprisonment operates not as a remedy coercive in its nature but as punishment for the completed act of disobedience, and to vindicate the authority of the law and the court. Therefore, to determine if the sanctions in the instant cause were criminal or civil in nature, it is necessary to determine the purpose behind each sanction: was it to coerce the appellees to obey the consent judgment decree, or was it to punish them for past violations?
64 Ohio St.2d at 253 (citations omitted).
Here, the court's actions were intended to force defendants' compliance with the terms of a consent decree. In that decree, defendants agreed that, as part of their wish to "terminate the lawsuit and settle and adjust any and all claims that may exist" they would abide by the terms of noncompetition agreements they signed with Tradesmen.
We think there is little doubt the court's contempt citation was designed to coerce defendant's into complying with the noncompetition agreements. The court's order stated that defendant's "contemptuous and recalcitrant behavior" in violating the consent decree required "substantial court intervention." In its findings of fact, the court scrupulously detailed numerous instances where both defendants violated the terms of the noncompetition agreements. Defendants hired roofers in violation of the noncompetition agreements. They dispatched electricians and electrician apprentices in violation of the noncompetition agreements. One of the defendants admitted making as many as fifty telephone calls in an attempt to develop his client base in the construction industry, an activity that violated the noncompetition agreements.
Because the terms of the noncompetition agreements against defendant Kahoe had expired and, in the case of defendant Cherotti, would have expired only sixteen days after the court's contempt findings, it might be argued that the court's decision to reinstate the noncompetition agreements for an additional six month period constituted a form of punishment, thus demonstrating criminal contempt. We would reject such an argument on grounds that the court's order is remedial in nature, not punitive.
The supreme court has said civil contempt contains an element of punishment, See Brown, 464 Ohio St.2d at 243, so even if there was a punitive element in the court's ruling it would not necessarily render the contempt criminal. The key inquiry here is whether the court's action was remedial or coercive. Id.
"Remedial" in this context relates to the remedy provided to one harmed by the willful contempt. The court's decision to continue the terms of the noncompetition agreements for an additional six months (the stated duration of the noncompetition agreements) simply restored the status quo between the parties — a purely remedial purpose.
Ordinarily, criminal contempt is characterized by an unconditional prison sentence. Brown, 64 Ohio St.2d at 254. As one of its proposed remedies, Tradesmen asked the court to order defendants to "do some weekends." Imposition of weekend incarceration would be a classic example of criminal contempt, for incarceration without an opportunity to purge the contempt would be punitive, not remedial. The court declined this request. The court's order that each defendant sever business contacts with the other is likewise coercive and remedial, for it also serves to restore the status quo under the noncompetition agreements.
We therefore find neither the court nor the parties erred by considering the contempt citation imposed on defendants to be civil in nature.
 B
The substance of the first and second assignments of error is that the court lacked clear and convincing evidence to find either defendant in contempt of the consent decree.
Civil contempt must be established by clear and convincing evidence. Morford v. Morford (1993), 85 Ohio App.3d 50. To establish contempt, a party must prove a valid court order exists, that defendant had knowledge of the order and violated the order. Arthur Young Co. v. Kelly (1990), 68 Ohio App.3d 287,295. In civil contempt motions, intent to violate the order need not be proven. Id. A reviewing court will not reverse a trial court's ruling on contempt absent an abuse of discretion.State ex rel. Delco Moraine Div., General Motors Corp. v. Indus.Comm. (1990), 48 Ohio St.3d 43, 44. We cannot reverse a trial court's decision if it is based upon competent and credible evidence. ConTex, Inc. v. Consolidated Technologies, Inc. (1988),40 Ohio App.3d 94, 97.
The court issued detailed findings of fact and conclusions of law showing it had more than enough evidence from which it could find by clear and convincing evidence that defendants violated the consent decree. The decree provided that "Kahoe and Cherotti shall abide by and obey the terms" of their employment contracts. Those contracts prohibited them from carrying on or engaging in any business that, either directly or indirectly, competes with Tradesmen by providing "skilled trades persons and safety related products to companies or individuals who require their service."
Tradesman is in the business of providing skilled workers to the construction industry. It provides skilled construction workers either by placing individual workers on an "as needed" basis or by agreeing to hire the entire workforce of a company and assuming all administrative requirements (tax withholding, workers' compensation, unemployment compensation, pensions, etc.) and leasing those employees back to the employer.
Cherotti joined Tradesmen in 1993; Kahoe joined Tradesmen, at Cherotti's suggestion, in 1995. Both signed noncompetition agreements that generally described Tradesmen's business as a construction labor contracting company which provides skilled tradespeople and safety-related products to companies or individuals requiring that service. Both agreed that they would not:
 "carry on, engage in, own, manage, operate., finance, consult, or contract with any business which is engaged in [the same business as Tradesmen] * * * or to solicit any customer or supplier of [Tradesmen] to cease doing business with [Tradesmen] * * *.
Kahoe resigned in April 1996., and near the end of 1996, Tradesmen learned that Kahoe had started his own business called Outsource, Inc., a business that competed directly against Tradesmen. Although Cherotti remained on the Tradesmen payroll, Cherotti not only permitted Kahoe to use the basement of his home to operate Outsource, Inc., but planned to quit Tradesmen and go into business with Kahoe. The two were using modified forms taken from Tradesmen and had contacted a Tradesmen employee with an offer to pay that employee $500 for any business leads. Defendants contacted some companies doing business with Tradesmen and managed to win over some of Tradesmen's business.
At this point, Tradesmen sought a restraining order. Defendants originally indicated a desire to challenge the validity of the noncompetition agreements but, after an evidentiary hearing, the parties entered into a consent decree, dated January 17, 1997, reaffirming the noncompetition agreements and agreeing to abide by them. The consent decree specifically provided that both defendants would abide by the terms of the noncompetition agreements beginning January 3, 1997, rather than from the respective dates that their employment with Tradesmen terminated. The consent also provided that Kahoe's term of noncompetition would run for only six months.
In October 1997, the court held hearings on Tradesmen's motion to hold both defendants in contempt for violating the consent decree. The court's findings of fact show Kahoe incorporated Electricians Unlimited in January 1997, with the specific purpose of entering into competition with Tradesmen. The court found Kahoe not only intended to copy Tradesmen's business, but modified a Tradesmen's "Client Services Agreement" and adapted it for his own use.
Cherotti formed his own company called Outsource Computer Upgrade Services, Inc. and allied himself closely with Kahoe's Outsource, Inc. They conducted their businesses from the same premises, and Kahoe leased office space from Cherotti. Cherotti's wife was an original incorporator of Kahoe's Electricians Unlimited, and she also worked for Kahoe by preparing brochures and creating an internet web site for Kahoe. Cherotti's sister also worked for Kahoe, performing secretarial tasks.
The court found that three of the accounts managed by Cherotti during the time he worked for Tradesmen left Tradesmen and became accounts for Electricians Unlimited. The evidence also showed that Kahoe leased out roofers, persons directly involved in the construction trade. Moreover, his Electricians Unlimited leased out "telecommunications technicians," a group of workers the court found were skilled workers who performed much the same work as electricians and could therefore be considered part of "construction labor" as that term was used in the noncompetition agreements.
Defendants primarily complain about the court's finding that telecommunications workers were the functional equivalent of electricians. They claim these workers do not compete directly with electricians and therefore do not fall within the noncompetition agreements.
We defer to the court's factual findings. See C.E. Morris Co.v. Foley Constr. Co. (1978), 54 Ohio St.2d 279. The court's factual findings state that "Kahoe incorporated Electricians Unlimited in January, 1997 with the specific purpose of entering into direct competition with his former employer, Tradesmen International, Inc. in the area of contracting for the services of electricians, electronic technicians, telecommunications workers and related tradesmen." While the court conceded that "arguably not all telecommunications work may be considered part of construction, some of it as described at the hearing certainly fits the definition of construction related work." The testimony showed Tradesmen often leased electricians to perform the same kind of "telecommunications" work as Electricians Unlimited, and the distinction between "electricians" and "telecommunications workers" may, under the circumstances presented here, have amounted to nothing more than euphemisms. Indeed, Tradesmen clearly showed that one of the companies that hired EU was an electrical company that had been one of Tradesmen's former clients. Hence, EU did indirectly what the consent decree forbade it from doing.
We find the court's factual findings fully supported by the record. Hence, the court did not abuse its discretion by finding defendant's in contempt of the consent decree. The first and second assignment of error should be overruled.
 II
In their third assignment of error, defendants complain that the court abused its discretion by ordering them to abide by their confidentiality and noncompetition agreements for an additional six months and by ordering them to sever all their business relationships with clients they stole from Tradesmen. They claim that Tradesmen offered only de minimus evidence of losses and that the court's punishment for contempt is out of proportion to those losses.
Given the court's wide discretion in imposing contempt citations, it follows that the courts are given fairly wide discretion in fashioning appropriate remedies and punishments. A court may hold a party in contempt for failure or refusal to comply with its orders and may impose such penalties as are reasonable and just. See Marshall v. Marshall (1997), 117 Ohio App.3d 182,186; Moraine v. Steger Motors, Inc. (1996), 111 Ohio App.3d 265.
The evidence showed that neither defendant complied with the terms of the consent decree and actively violated the terms of their non-competition agreements after signing the consent decree. Although the six month terms of the noncompetition agreements either expired at the time the court conducted the contempt hearing or were about to expire, the court's failure to further impose the actual terms of the non-competition agreements may well have nullified those agreements. In other words, had the court not extended those agreements, defendants' violation of the consent decree would have been a contempt of a court order with no repercussions.
Moreover, the court recognized that both defendants were likely to engage in future collusive activity, particularly given their past conduct under the consent decree. The court stated:
 However, the court finds that the continuing close relationship that exists between these two individuals, particularly while they are both enjoined from competing with Tradesmen is fraught with opportunities for improper cooperation and collusion. In light of the ample record evidence of other violations of the defendants' Confidentiality and Non-Competition Agreements and the January 22, 1997 Injunction and Judgment Entry On Consent, the court finds that there is a need to impose some condition which will help in monitoring the future collusive behavior of defendants Cherotti and Kahoe.
The court's findings are amply supported by the record and do not constitute an abuse of discretion under the circumstances. The third assignment of error is overruled.
 III
The fourth assignment of error states that the court abused its discretion by ordering defendants to pay attorney fees where there was no showing that defendants violated the court's injunction and consent decree.
Defendants waived the right to contest attorney fees when they withdrew any objection to Tradesmen's motion for attorney fees. Upon issuing its findings of fact and conclusions of law relating to the contempt ruling, the court ordered Tradesmen to file a motion for attorney fees within five days and ordered defendants to respond to the motion within five days. Defendants originally requested a hearing be held on the motion, but subsequently withdrew their objection stating they "hereby 1) withdraw their Motion for a Hearing on Plaintiff's Application for Attorney Fees and costs and 2) request that judgment be entered against them in an amount deemed appropriate."
As this quoted language demonstrates, defendants waived the right to challenge the imposition and amount of fees by withdrawing their objection to Tradesmen's motion for attorney fees. Opposing counsel's objection to attorney fees in the lower court is a prerequisite to appellate review. See, e.g., Procterv. Procter (1988), 48 Ohio App.3d 55, 62 (failure to object to referee's report ordering attorney fees held to waive the matter on appeal); Dewey v. Dewey (July 19, 1991), Fulton App. No. 90FU000014, unreported. Because defendants agreed to both the imposition of fees and the amount of fees, they waived the right to this argument on appeal. The fourth assignment of error is overruled.
 IV
In their fifth assignment of error, defendants complain the court erred by failing to review the validity of the non-competition agreements.
The general rule is that where the meaning of terms of a settlement agreement is disputed, or where there is a dispute that contests the existence of a settlement agreement, a trial court must conduct an evidentiary hearing prior to entering judgment. Rulli v. Fan Co. (1997), 79 Ohio St.3d 374, syllabus. In this case, the meaning of the settlement agreement is not at issue — defendants do not question that they entered into a valid consent decree whose terms were clear.
This distinction is important, for the defendants had the opportunity to contest the validity of the noncompetition agreements before agreeing to abide by them. Once they entered into the consent decree, they forfeited the right to question the validity of the noncompetition agreements. In Association ofCommunity Orgs. for Reform Now v. Edgar (C.A.7, 1996),99 F.3d 261, 262, the court stated:
 A party to a consent decree or other judgment entered by consent may not appeal unless it explicitly reserves the right to appeal. The purpose of a consent judgment is to resolve a dispute without further litigation, and so would be defeated or at least impaired by an appeal. The presumption, therefore, is that the consent operates as a waiver of the right to appeal. It is because the parties should not be left guessing about the finality and hence efficacy of the settlement that any reservation of a right to appeal should be explicit.
See, also, Slaven v. American Trading Transp. Co., Inc. (C.A.9, 1998), 146 F.3d 1066, 1070; Dorse v. Armstrong World Indus. Inc.
(C.A.11, 1986), 798 F.2d 1372, 1375.
The court considered this same claim and rejected it on the basis that defendants' execution of the consent decree did not specifically reserve the right to contest the validity of the noncompetition agreements. The court correctly noted defendants agreed "to abide by and obey the terms of those agreements as written * * *." With no reservation of the right to contest the noncompetition agreements, we find the court did not err by refusing to entertain a challenge to them. The fifth assignment of error is overruled.
Judgment affirmed.
It is ordered that appellees recover of appellant their costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 ________________________________ JOHN T. PATTON, PRESIDING JUDGE
 LEO M. SPELLACY, J. CONCURS, ANNE L. KILBANE, J., CONCURSIN PART AND DISSENTS IN PART. SEE CONCURRING AND DISSENTINGOPINION, ANNE L. KILBANE, J., ATTACHED.