198 F.Supp.2d 1093 (2002)
Elaine L. CHAO, Secretary of Labor, U.S. Department of Labor, Petitioner,
v.
Chester McDOWELL, Virginia Gaddy, and Southwest Quarry & Materials, Inc., Respondents.
No. 4:98CV1715ERW.
United States District Court, E.D. Missouri, Eastern Division.
January 29, 2002.
*1094 Edwin B. Brzezinski, Sr., Asst. U.S. Attorney, Joseph M. Landolt, Asst. U.S. Attorney, Office of U.S. Attorney, St. Louis, MO, Edward Falkowski, U.S. Department of Labor, Denver, CO, for plaintiff.
David L. Mills, Emily L. Woodward, Thomas and Birdsong, Rolla, MO, for defendants.

MEMORANDUM AND ORDER
WEBBER, District Judge.
This matter is before the Court on Petitioner Elaine L. Chao, Secretary of Labor, United States Department of Labor's ("Petitioner") Petition for Adjudication of Contempt [doc. # 14]. A hearing was held on this matter on January 25, 2002. Petitioner and Respondent each presented witnesses and arguments during this hearing.

I. STATEMENT OF FACTS.

A. DECEMBER 2001 INCIDENT.
In November 1998 this Court entered a permanent injunction which enjoined the Respondents in the following manner:
. . . defendants, Chester McDowell and Southwest Quarry & Materials, Inc., their agents, servants, and employees, and all persons in active concert and participation with them, are hereby permanently enjoined and restrained:
1. From directly or indirectly denying Mine Safety and Health Administration (MSHA) inspectors entry to, upon, or through their mine (currently known as the Southwest Quarry);
2. From refusing to permit inspection of the mine, or of any equipment located on the mine site;
3. From interfering with, hindering, or delaying such inspectors in carrying out the provisions of the Mine Safety and Health Act of 1977 (Mine Act), 30 U.S.C. § 801, et seq.;
4. From threateningwith words, or actions, or both words and actionsany such MSHA inspectors with physical harm.
Judgment of November 24, 1998, at 1-2. The Judgment further provided the following:
1. If, after entry of this judgment, any MSHA inspector encounters a violation of any of the above paragraphs 1-4, then (in addition to any other remedy which may be available under this order or under the Mine Act) such inspector may request the U.S. Marshal's Service to provide a marshal to accompany the inspector during inspection of the mine. Upon receiving such request, the U.S. Marshal's service will provide a marshal to accompany the MSHA inspectors on inspections of the mine until such time as the inspectors reasonably believe that the situation at the mine will not jeopardize *1095 their personal safety or interfere with their ability to carry out their duties under the Act. The defendants shall bear all costs involved with regard to the accompaniment of the U.S. Marshals.
2. Whenever any employees or other persons are present at the mine site, a competent person, present at the site, shall be designated by the mine operator to be the person in charge. If Chester McDowell has been designated as the person in charge, and Mr. McDowell is not present at the site, another individual shall be designated as the person in charge in his absence.
Id. at 2.
The following events precipitated the Petitioner's filing of this Petition. Mr. Larry Feeney (a supervisor and a federal mine inspector with the MSHA) and Mr. Michael Davis (acting District Manager of the MSHA for the South-Central District)[1] were assigned to inspect the Southwest Quarry mining operation. It was not normal practice for district managers and supervisors to inspect mining operations in the field; however, the MSHA had determined that supervisors and district managers should spend more time in the field. Mr. Feeney and Mr. Davis were assigned to inspect ten different mining operations, including Southwest Quarry.
On December 11, 2001, Mr. Feeney and Mr. Davis arrived at the Southwest Quarry at 9:40 a.m. At 9:48 a.m., they went into the scale house where Virginia Gaddy[2] was working. They announced to Ms. Gaddy that they were federal mine inspectors, and Mr. Davis handed her his business card. Mr. Feeney informed her that they were there to perform a regular inspection. Ms. Gaddy informed them that Mr. Chester McDowell, the quarry superintendent, was not present and they could not inspect the mine without him. Larry then asked for Troy Gaddy, who was listed in their records (MSHA form 4000-49A), as a person in charge who could accompany them while they inspected the mines. Ms. Gaddy said that Troy Gaddy was operating the crusher, and could not accompany them on the inspection. Mr. Davis at that point offered to inspect the mine without an employee accompanying them, but Ms. Gaddy stated that Mr. McDowell had forbidden them to inspect the mining operation alone. The inspectors informed Ms. Gaddy that they had a legal right to inspect and they asked her to contact Mr. McDowell immediately. Ms. Gaddy told the two inspectors that they would have to wait until Mr. McDowell arrived, at which point he would accompany them while they did their inspection. Ms. Gaddy told them to wait outside until Mr. McDowell returned from his trip into town.
Mr. Feeney and Mr. Davis went outside and waited for a little while. At 10:06 a.m., they returned to the scale house. When they asked how long before Mr. McDowell would return, she responded that although she had contacted him, she did not know how long he would be. They asked her where he was, and she informed them that he was in town. They informed her at that time that the delay was impeding their inspection, and that they would give her five minutes to allow them to inspect unless she could tell them a reasonable time for Mr. McDowell's arrival. Thereafter they returned to their vehicle. Mr. Davis' affidavit suggests that Ms. Gaddy was upset by this time.
They waited 10:30 a.m. before they returned to the scale house and informed *1096 Ms. Gaddy that they needed to do the inspection now or they would have to issue a citation. She refused to allow them to inspect the mine, and Mr. Feeney issued the citation for impeding their inspection. She refused to sign it. Mr. Davis informed her that her signature was not required, and that the citation had a termination time of ten minutes, at which time a noncompliance order would be issued. Ms. Gaddy told the inspectors, for the first time, that Mr. McDowell had been on the quarry property since 10:05 a.m. The inspectors reiterated that they had ten minutes to comply with the citation and that they would be waiting in the car. At that point, they returned to their car.
At 10:50 a.m., Mr. Davis and Mr. Feeney observed Ms. Gaddy leave the scale house, walk across the haul road and hand the citation to a man who had parked his white pickup truck across from the inspectors' car ten minutes previously. The inspectors, who had never seen Mr. McDowell before, had observed this same person drive onto the quarry property at 10:15 a.m. He had driven off a couple of times in different directions while the inspectors were waiting for Mr. McDowell, but had returned to the scale house a few minutes later both times. When Ms. Gaddy handed this person the citation, he became furious and began walking towards the inspectors. As he was walking, he began tearing up the citation. The inspectors at this point assumed that this man was Mr. McDowell. He walked up to the car and went up to the driver's side window where Mr. Feeney was sitting and began cursing at him. When Mr. McDowell finished tearing up the citation, he threw it in Mr. Feeney's face. Mr. Feeney attempted to calm him down at this point, informing Mr. McDowell that they were simply there to perform a regular inspection. Mr. McDowell, however, was not to be deterred, calling Mr. Feeney and MSHA a "bunch of fucking leeches" and telling them to get real jobs. Mr. Feeney reminded Mr. McDowell of the permanent injunction issued by this Court, but Mr. McDowell stated "fuck them" and that he "did not give a shit." He then told the inspectors to get their "asses of the property." When the inspectors attempted to reason with Mr. McDowell again, he told them to "get your fucking ass off my propertynow." Mr. Davis, who was sitting in the passenger seat, believed that Mr. Feeney was in danger of being struck by Mr. McDowell because he was so agitated. However, Mr. McDowell left and began walking back to his truck.
Mr. Davis at this time exited the vehicle and introduced himself to Mr. McDowell, offering to shake his hand. Mr. McDowell said he did not "give a fuck" who he was, and said that they "were all a bunch of leeches." Mr. Davis ended his attempt to resolve the situation, and returned to the car.
At this point, Mr. Feeney and Mr. Davis decided to follow procedure and write up a § 104(b) Order, the substance of which indicates that the previously issued citation was disregarded. Mr. Feeney then walked up to Mr. McDowell and handed him the § 104(b) Order and once again requested Mr. McDowell allow them to conduct their inspection and resolve the citation. Mr. McDowell said that the inspection was not going to happen, and told them to "Get the fuck off the property."
Mr. Feeney testified further that he lives in the Rolla area, and that because of Mr. McDowell's actions that day, he remains watchful and cautious because he was aware of mining inspectors who had been beaten within an inch of their lives and he was concerned about Mr. McDowell's behavior.

B. SEPTEMBER 1998 INCIDENT.
The above incident was not Mr. McDowell's first run-in with inspectors from the *1097 MSHA. The events which transpired in September 1998, detailed below, ultimately led to this Court's entering the permanent injunction.
In September 1998, a MSHA inspector, Robert D. Seelke, was doing a follow-up inspection of Southwest Quarry. When he arrived at the quarry, he entered the scale house and was directed to see Mr. Troy Gaddy. Mr. Gaddy was supervising the crusher operation. On his way to speak with Mr. Gaddy, Mr. Seelke noticed some violations that he had not previously noted in his August 1998 inspection. Mr. Seelke spoke with Mr. Gaddy and informed him that many of the violations that Mr. Seelke had noted in his August 1998 inspection were abated, but he also informed him of the new violations he had noticed. Mr. Gaddy said that he would abate the violations Mr. Seelke had noticed. Mr. Seelke wrote up citations for the violations that he had observed as was required by procedures he followed.
After speaking with Mr. Gaddy, Mr. Seelke went into the scale house to speak with Mr. McDowell who had just returned from lunch. Mr. Seelke informed Mr. McDowell of the results of his inspection, and of the fact that he was going to issue citations for the unabated violations he had noted. Mr. McDowell said that Mr. Seelke was not going to issue the citations, and proceeded to become agitated. Mr. McDowell began cursing at Mr. Seelke, calling him a "MSHA mother-fucking son of a bitch." Mr. Seelke realized that the situation was deteriorating and began to exit the scale house. Mr. McDowell, who had previously been seated at his desk, came out from behind his desk and continued to curse at Mr. Seelke. When Mr. Seelke turned his back on Mr. McDowell to exit the scale house, Mr. McDowell pushed Mr. Seelke out the door. He followed Mr. Seelke to his car and continued to curse at him, finally saying to him that "someone should just kill you." Mr. Seelke, concerned for his own safety, left the quarry and reported the incident to his supervisors. Throughout his encounter with Mr. McDowell, Mr. McDowell's voice was elevated, he was pointing his finger in Mr. Seelke's chest, and was very close to Mr. Seelke.

C. MAY 7, 1986 INCIDENT.
A third incident, referenced in the hearing and in the Court's file, occurred between MSHA inspectors and Mr. McDowell in May 1986. On May 7, 1986, Howard Lucas, a supervisor in the Rolla MSHA office, and Billy K. Terry, attempted to conduct an inspection at Southwest Quarry. When they arrived at the property, Mr. McDowell, who had been operating a front end loader, climbed down from the loader, picked up a metal pipe or rod and began walking toward them. Just before he got to the inspectors, he tossed the pipe/rod aside. Inspector Lucas explained to Mr. McDowell that they were there to make a compliance inspection, and that they had observed several safety violations. Mr. McDowell became very angry and ordered the inspectors to leave and to not come back without a court order. The inspectors attempted to reason with Mr. McDowell, but Mr. McDowell stepped towards Mr. Terry with his fist drawn back and stated that he had told him before not to ever come back onto his property.[3] *1098 Mr. McDowell then told Mr. Terry that he would punch him in the mouth if he did not leave immediately. Mr. Terry left, and walked back to the car while Inspector Lucas attempted to reason with Mr. McDowell. Mr. McDowell was not to be dissuaded, and the inspectors left the property.

II. ANALYSIS.
"A party seeking civil contempt bears the initial burden of proving, by clear and convincing evidence, that the alleged contemnors violated a court order." Chicago Truck Drivers v. Brotherhood Labor Leasing, 207 F.3d 500, 505 (8th Cir.2000) (citing Independent Fed'n of Flight Attendants v. Cooper, 134 F.3d 917, 920 (8th Cir.1998)).

A. CIVIL VERSUS CRIMINAL CONTEMPT.
In 18 U.S.C. § 401, Congress defined the scope of the contempt powers of the federal courts. The statute reads as follows:
A court of the United States shall have such power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; (2) Misbehavior of any of its officers in their official transactions; (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.
The Eighth Circuit has held that this statute governs both civil and criminal contempt. Coleman v. Espy, 986 F.2d 1184, 1190 (8th Cir.1993) (citing United States ex rel. Shell Oil Co. v. Barco Corp., 430 F.2d 998, 1000 (8th Cir.1970)); see also Taylor v. Finch, 423 F.2d 1277, 1279 (8th Cir.) ("Courts have power to adjudge persons who willfully disobey their orders to be in contempt and such power extends to both civil and criminal contempt."), cert. denied, 400 U.S. 881, 91 S.Ct. 125, 27 L.Ed.2d 119 (1970).
Civil contempt is "remedial in nature and designed both to coerce obedience and to compensate the complainant for losses sustained . . . ." James Wm. Moore et al., Moore's Federal Practice ¶ 65.80 (3d ed.1999). Criminal contempt's purpose is to "vindicate the court's authority and dignity." Id. Whereas civil contempt sanctions, "or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and . . . may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard," "`criminal contempt is a crime in the ordinary sense,' and `criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings . . . .'" International Union, United Mine Workers of America v. Bagwell, 512 U.S. 821, 827, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (quoting Bloom v. Illinois, 391 U.S. 194, 199, 201, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968); Hicks v. Feiock, 485 U.S. 624, 632, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988)).
Although the procedural contours of the two forms of contempt are well established, the distinguishing characteristics of civil versus criminal contempts are somewhat less clear. In the leading early case addressing this issue in the context of imprisonment, Gompers v. Bucks Stove & Range Co., 221 U.S., at 441, 31 *1099 S.Ct. 492 . . ., the Court emphasized that whether a contempt is civil or criminal turns on the `character and purpose' of the sanction involved. Thus, a contempt sanction is considered civil if it `is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court.
Id. at 827-28, 114 S.Ct. 2552. However, as the Supreme Court acknowledged in Bagwell, the stated purpose alone behind a contempt sanction is not determinative because, inevitably, most contempt sanctions intend to both "punish a prior offense as well as coerce an offender's future obedience." Id. at 828, 114 S.Ct. 2552. Therefore, whether a contempt sanction is criminal or civil in nature depends not on the subjective intent of the court in imposing the sanction, but rather upon "an examination of the character of the relief itself." Id. (quoting Hicks, 485 U.S. at 636, 108 S.Ct. 1423). For example, imprisonment for a fixed term can be coercive, and therefore deemed a civil contempt sanction, if "the contemnor is given the option of earlier release if he complies. In these circumstances, the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus `carries the keys of his prison in his own pocket.'" Id. (citations omitted).

B. LEGAL STANDARDS FOR A FINDING OF CIVIL CONTEMPT.
At issue in this case is whether Defendant should be held in civil contempt for its alleged wilful violations of this Court's orders. "`The contempt power is a most potent weapon, and therefore it must be carefully and precisely employed.'" Independent Federation of Flight Attendants v. Cooper, 134 F.3d 917, 920 (8th Cir.1998) (quoting Mahers v. Hedgepeth, 32 F.3d 1273, 1275 (8th Cir.1994)). "One of the overarching goals of a court's contempt power is to ensure that litigants do not anoint themselves with the power to adjudge the validity of orders to which they are subject." Chicago Truck Drivers, 207 F.3d at 504 (citing United States v. United Mine Workers, 330 U.S. 258, 290 n. 56, 67 S.Ct. 677, 91 L.Ed. 884 (1947)). Absent the ability to hold a party in contempt for wilful violations of court orders, a court is made "impotent, and what the Constitution now fittingly calls the `judicial power of the United States' would be a mere mockery.'" United Mine Workers, 330 U.S. at 290 n. 56, 67 S.Ct. 677 (quoting Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 450, 31 S.Ct. 492, 55 L.Ed. 797 (1911)).
Civil contempt may be employed either to coerce the defendant into compliance with a court order or to compensate the complainant for losses sustained, or both. Either incarceration or a fine may accomplish the purpose of coercion, while "where compensation is intended, a fine is imposed, payable to complainant." . . . A party seeking civil contempt bears the initial burden of proving, by clear and convincing evidence, that the alleged contemnors violated a court order.
Chicago Truck Drivers, 207 F.3d at 505 (quoting United Mine Workers, 330 U.S. at 304, 67 S.Ct. 677). Where it is undisputed that the defendant has violated a court order, the burden shifts back to the defendant to show that compliance is presently impossible. Id. (citing United States v. Rylander, 460 U.S. 752, 757, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983)). "To show that compliance is presently impossible, the defendant must demonstrate: `(1) that they are unable to comply, explaining why categorically and in detail, (2) that their inability to comply was not self-induced, and (3) that they made in good faith all reasonable efforts to comply.'" United States v. Santee Sioux Tribe of Nebraska, *1100 254 F.3d 728, 736 (8th Cir.2001) (quoting Chicago Truck Drivers, 207 F.3d at 506).
If the Court determines that civil contempt is appropriate, there are several factors that the Court must consider in determining the nature of the civil contempt sanction. As noted above, "judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." United Mine Workers, 330 U.S at 303-04, 67 S.Ct. 677 (citing Gompers, 221 U.S. at 448-49, 31 S.Ct. 492).
Where compensation is intended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of complainant's actual loss, and his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy. But where the purpose is to make the defendant comply, the court's discretion is otherwise exercised. It must then consider the character and magnitude of the harm threatened by continued contumacy, and the probably effectiveness of any suggested sanction in bringing about the result desired. It is a corollary of the above principles that a court which has returned a conviction for contempt must, in fixing the amount of a fine to be imposed as a punishment or as a means of securing future compliance, consider the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant.
Id. at 304, 67 S.Ct. 677.
In this instance, the Court is struck by the gravity of this situation. On four separate occasions, Mr. McDowell has impeded the ability of MSHA inspectors to conduct normal, regulatory inspections of Southwest Quarry. On two of those occasions, Mr. McDowell has threatened physical harm, and on one of those occasions he shoved an inspector. This conduct is not to be tolerated.
The Court concludes that the Petitioner has met its burden to adduce clear and convincing evidence that Respondents violated the Court's November 24, 1998 Order. Furthermore, Respondents have not shown that compliance with the Court's November 24, 1998 Order is presently impossible. Because of the magnitude of the harm involved, and the persistent nature of Mr. McDowell's offenses, the Court will now impose civil contempt sanctions in the amount of $100,000.00 on the Respondents. However, this sanction will be suspended provided that the Respondents abide by the provisions found in the Court's November 24, 1998 Order. If Respondents should, in the future, impede in any fashion a lawful inspection conducted by MSHA inspectors pursuant to their authority under 30 U.S.C. § 801 et seq., the Court will remove the suspension and require the sum be paid. Furthermore, because of Mr. McDowell's pattern of persistent interference with the lawful actions of MSHA inspectors, Mr. McDowell is sentenced to a thirty-day period of incarceration. However, that sentence is also suspended, and the suspension will be removed if Mr. McDowell violates the terms of the Court's November 24, 1998 Order. These civil contempt sanctions are imposed for the purpose of coercing Respondents' compliance with the November 24, 1998 Order.
Accordingly,
IT IS HEREBY ORDERED that the Respondents are found in contempt of the Court's November 24, 1998 Order.
IT IS FURTHER ORDERED that civil contempt sanctions are levied against the Respondents in the amount of $100,000.00. This sanction is presently suspended, and *1101 the suspension will be removed should Respondents violate the terms of the November 24, 1998 Order in any fashion.
IT IS FURTHER ORDERED that Mr. Chester McDowell is sentenced to a thirty day period of incarceration for his wilful contempt of the Court's November 24, 1998 Order. This sentence is suspended, and the suspension will be removed should Mr. McDowell violate the terms of the November 24, 1998 Order of this Court in any fashion.
NOTES
[1] In December 2001, Mr. Davis was the Assistant District Manager for the South-Central District. The South-Central District encompasses six states, including Missouri.
[2] Ms. Gaddy is Chester McDowell's sister and the daughter of the mine's owner.
[3] Apparently, Mr. McDowell had threatened Mr. Terry on a previous occasion. In the "Conference Transcript," found in the Court file attached to the Affidavit of Terry Phillips [doc. # 5], Mr. Phillips describes an incident which occurred on December 23, 2985 where Inspector Terry was making an inspection and attempting to issue a citation when Mr. McDowell ordered him off the property. See Conference Transcript at 1. There is no indication in this transcript that Mr. McDowell threatened bodily harm; however, during this incident in December 1985 or during some other incident which occurred between Mr. Terry and Mr. McDowell in 1985, Mr. McDowell threatened Mr. Terry with bodily harm. This makes four separate incidents during which Mr. McDowell interfered with, threatened, or shoved a MSHA inspector.