In the Matter of DIRECT CRIMINAL CONTEMPT PROCEEDINGS

John R. Hunt, Appellant–Petitioner,

v.

Martin County Circuit Court, Appellee–Respondent.

No. 51A01–0607–CV–274.

Court of Appeals of Indiana.

April 20, 2007.

Fremont O. Pickett, Shoals, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Frances H. Barrow, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

Today we address chapter two in the somewhat related case of *Nolan v. Taylor*, No. 51A05–0608–CV–442, 2007 WL 1166034, 864 N.E.2d 419 (Ind.Ct.App. April 20, 2007), that we are also handing down today. Appellant-petitioner John R. Hunt, the Circuit Court Clerk of Martin County, appeals the trial court's finding that he was in direct criminal contempt. Specifically, Hunt argues that the judgment was erroneous because the trial court lacked jurisdiction over the matter and that the contempt finding must be set aside "because there was no hearing that the court could attach a direct violation to." Appellant's Br. p. 12. Concluding that it was error to find Hunt in direct criminal contempt in these circumstances, we reverse the judgment of the trial court.

## FACTS

On May 15, 2006, the trial court accepted Sonja Holt's guilty plea to driving while intoxicated with a controlled substance in her body,[1] a class C misdemeanor. Thereafter, the trial court ordered Hunt to apply $613.50 of Holt's $750 bond to certain fines, fees, and costs and to refund the remaining amount to her. However, a signed copy of the order contained undated handwritten notations indicating that the actual payments from Holt's bond were $866. The notations indicate that the difference of $116 was to be paid "to probation." Appellant's App. p. B–1. However, another signed copy of this order contained no handwritten notes. *Id.* at B–23.

The trial court further advised Holt that she would not receive any money for a few weeks because the clerk of the court had not processed or released any bonds since

1. Ind.Code § 9–30–5–1.

March 14, 2006. On May 31, 2006, the trial court directed Hunt to certify his compliance with its order by June 2, 2006.

On June 7, 2006, Holt telephoned a court reporter, indicating that she had called Hunt's office and spoke with an individual who informed her that the clerk would not process or release the bond because "the judge needed to sign off on something," and that the clerk was "waiting on the judge." *Id.* at E19.

Thereafter, Holt telephoned the judge's office to learn why the appropriate orders had not been entered. While Holt was on the line, the court reporter checked the computerized case management system and determined that the trial court had, indeed, completed the necessary paperwork after the plea agreement had been entered on May 15, 2006. The court reporter also noted that the clerk had certified its compliance with the trial court's order. As a result, the court reporter informed Holt that she did not understand why anyone in the clerk's office would tell her that additional information was required from the court before the bond could be released.

Holt again contacted the trial court and told the court reporter of her conversation with the clerk's office. Specifically, Holt indicated that she had spoken with Deputy Clerk Bobbi S. Nonte and asked Nonte to identify the individual whom she had spoken with during the initial telephone call to the clerk's office. Nonte stated that she did not know and declined to further investigate the matter. However, Nonte denied that anyone would have told Holt that the "judge needed to sign off on something" or that the clerk was "waiting on the judge." *Id.* While Nonte initially told Holt that the bond had probably been released, she then stated that she was not sure. Finally, Holt told the court reporter that Nonte informed her that the personnel in the

clerk's office were "learning how to release [the bond], and that she should call again in a couple of weeks." *Id.* As a result of this conversation, the court reporter informed Holt that the trial judge would investigate the matter.

At some point, the trial judge and the court reporter went to the clerk's office to examine Holt's file. They found Hunt in another room and asked him to accompany them to the clerk's office. One of the deputy clerks located Holt's file, and the trial judge found the May 30, 2006 certification, which indicated that the clerk had complied with the trial court's order. However, the judge also saw a handwritten note on the file stating that the bond still "need[ed] to be released." *Id.*

Nonte informed the trial judge that the bond had not been released despite the certification. However, Nonte and Hunt denied making any statements to Holt regarding the status of the bond. Immediately thereafter, the trial judge directed Hunt and his chief deputy into the courtroom for contempt proceedings. Although Hunt remarked that he did not have a "chief deputy," the trial judge told Hunt to appoint someone, but Hunt refused to do so. *Id.* Once in the courtroom, the trial judge indicated that he believed Nonte was the chief deputy clerk because she had represented herself as such at some point during a commissioner's meeting. After Nonte laughed, the trial judge informed Hunt that he was being charged with direct criminal contempt for not immediately processing the court's orders and for certifying that he had complied with the orders when he had not. The trial judge observed that "[w]e have a situation where someone is quite upset, and they are contacting us saying that they are being given information that it's our fault. Obviously, that is not the case." *Id.* at 6–7. The trial judge then informed Hunt that he was not

doing his job and determined that "because it's impossible for the court to discharge its duties, because in effect you have shut us down ... you are hereby found in direct contempt of court, that being criminal contempt." *Id.* at 9. As a result, Hunt was sentenced to two days in jail and fined $1000. *Id.* On June 9, 2006—two days after the contempt hearing—the bond was released with the notation: "$516 for court fees." *Id.* at B4.

In a June 13, 2006, order denying Hunt's motion to set aside the contempt finding, the trial judge explained that he did not intend to use his contempt powers to coerce the clerk to comply with existing orders but to punish the clerk "for filing a false 'Certification' establishing that the clerk had complied with orders when in fact, the clerk had not complied with the orders, and for engaging in conduct that caused the public to question the integrity of the judicial process and the integrity of the Court and Court officials." *Id.* at 21–22. Hunt now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

■■■ In addressing Hunt's contentions, we initially observe that contempt proceedings may be generally categorized as civil or criminal, according to the nature and purpose of the sanction imposed. *Jones v. State*, 847 N.E.2d 190, 199 (Ind. Ct.App.2006). A civil contempt is a violation of a court order resulting in a proceeding for the benefit of the aggrieved party. *Nat'l Educ. Ass'n v. South Bend Cmty. Sch. Corp.*, 655 N.E.2d 516, 522 (Ind.Ct.App.1995). Hence, any type of penalty in a civil contempt proceeding must be coercive or remedial in nature. *Id.* By contrast, a criminal contempt is an

act directed against the dignity and authority of the court that obstructs the administration of justice and tends to bring the court into disrepute. *State v. Heltzel*, 552 N.E.2d 31, 34 (Ind.1990). Accordingly, a criminal contempt sanction is punitive in nature because its purpose is to vindicate the authority of the court, and it benefits the State rather than the aggrieved party. *Int'l Union, UMWA v. Bagwell*, 512 U.S. 821, 826–28, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994).

■■■ We further note that contempt may be direct or indirect. *Jones*, 847 N.E.2d at 199. Direct contempt involves actions in the presence of the court, such that the court has personal knowledge of them. *Pryor v. Bostwick*, 818 N.E.2d 6, 12 (Ind.Ct.App.2004). However, direct contempt includes any act committed in the presence of, and with knowledge of, the court that manifests a disrespect for and defiance of a court. *Hopping v. State*, 627 N.E.2d 875, 878 (Ind.Ct.App.1994). Courts have inherent power to summarily punish acts of direct contempt without formal charges or an evidentiary hearing. *In re Nasser*, 644 N.E.2d 93, 95 (Ind.1994). "The purpose of this power is to enable the court to protect itself against gross violations of decency and decorum." *Id.*

■■■ On the other hand, an act of indirect contempt undermines the orders or activities of the court but involves actions outside the trial court's personal knowledge. *Williams v. State ex rel. Harris*, 690 N.E.2d 315, 316 (Ind.Ct.App.1997). In general, an individual who willfully disobeys any order lawfully issued by any court of record or by the proper officer of the court is guilty of indirect contempt. Ind.Code § 34–47–3–1.[2] Indirect con-

---

2. Specifically, this statute provides:

"A person who is guilty of any willful disobedience of any process, or any order lawfully issued:

tempt proceedings require the appointment of a special judge in some cases, and the defendant is entitled to an array of due process protections, including notice and an opportunity to be heard. *Nasser*, 644 N.E.2d at 95; *see also* Ind.Code §§ 34–47–3–5 to –7.

The statute under which Hunt was charged, Indiana Code section 34–47–2–1, provides:

> (a) Every person who disturbs the business and proceedings of a court:
>
> > (1) by creating any noise or confusion;
> >
> > (2) in a court of record; and
> >
> > (3) while the court is open for and engaged in the transaction of business; is considered guilty of a direct contempt of court.
>
> (b) This section applies to a disturbance caused:
>
> > (1) by the commission of a felony, a misdemeanor, or an other unlawful act;
> >
> > (2) by talking, moving about, or by signs, or gestures; or
> >
> > (3) in any other manner.

When reviewing a trial court's finding of direct contempt, we accept as true the statement entered of record by the trial court of the conduct constituting the contempt. *Hopping*, 627 N.E.2d at 878. However, we will examine the record, if necessary, to determine whether the conduct alleged to be contemptuous does, in fact, constitute contempt. *Id.* at 878. We will not interfere with the trial court's judgment unless it appears that the judgment is erroneous. *Id.*

> (1) by any court of record, or by the proper officer of the court;
> (2) under the authority of law, or the direction of the court; and

## II. Hunt's Claims

Hunt contends that the finding of direct criminal contempt must be set aside because the trial court lacked jurisdiction to order him to turn over funds from the clerk's office to Holt. Moreover, Hunt argues that the finding of contempt cannot stand because "there was no hearing of any kind." Appellant's Br. p. 9.

Before proceeding to the merits of Hunt's arguments, we initially observe that Hunt's counsel has seen fit to present some historical background in his appellate brief regarding a perceived feud between the Hunts and the family of the trial judge in this matter. *Id.* at 4–5. Although interesting and informative, the State points out that there is no citation to the record in support of those statements. Thus, we do not consider that information for purposes of this appeal. *See Frye v. Vigo County*, 769 N.E.2d 188, 194 n. 5 (Ind.Ct. App.2002) (noting that we cannot consider matters outside the record).

On the other hand, we note that in the somewhat related case that is also being handed down today, the Martin County Democratic Precinct Committee appointed Hunt as clerk of the Martin County courts in 2005 after the former clerk had resigned. Sixteen of the eighteen members of the committee voted. Half of them voted for Hunt, and the remaining members voted for Nolan. The County Chairman, Richard Taylor, was entitled to break the tie, so he cast a second vote for Hunt. Thereafter, Nolan filed an action in the trial court requesting that the board's vote and Hunt's appointment be set aside. However, following a change of venue, the matter was heard in a Dubois County trial court. The trial court ultimately deter-

> (3) after the process or order has been served upon the person;
> is guilty of an indirect contempt of the court that issued the process or order."

mined that Hunt was legally elected as the clerk for Martin County to complete the term of the former clerk who had resigned.[3] On appeal, we held that because the trial court lacked jurisdiction over the matter, we also had no jurisdiction to decide the case on the merits. *Nolan*, slip op. at 10, 2007 WL 1166034, 864 N.E.2d at 424. Thus, we determined that the trial court properly dissolved a preliminary injunction that had been issued, and we remanded the case to the trial court with instructions to dismiss Nolan's petition. *Id.* at 11, 864 N.E.2d at 424.

In this case, the record certainly supports the notion that a breakdown in communication occurred between the trial court and personnel in the clerk's office. As the State points out, Holt received conflicting information from the court reporter and personnel in the clerk's office regarding the status of the potential refund of her bond money. Appellant's App. p. E–1, E–19. As a consequence, the trial judge examined Holt's file and discovered a certification indicating that the clerk's office had complied with the order regarding Holt's bond. However, the trial judge then noticed the handwritten note suggest-ing that the bond still "need[ed] to be released." *Id.* at 21. Furthermore, Hunt denied that he or anyone else in the clerk's office made any of the statements that Holt had conveyed to the court reporter. *Id.*

In our view, even assuming without deciding that Hunt misrepresented the bond's actual release, we cannot agree that such conduct rose to the level of direct criminal contempt. As noted above, direct criminal contempt involves actions in the court's presence that disturb its business and proceedings. The statute speaks specifically of a disturbance that is created by noise or confusion that is manifested by "talking, moving about, or by signs or gestures." I.C. § 34–47–2–1. Hence, we cannot say that Hunt's actions were punishable under the direct criminal contempt statute, and the judgment must be set aside. Moreover, it is apparent that Hunt's actions were more of the type contemplated under the indirect criminal contempt statute—conduct that stemmed from his alleged disobedience of the trial court's order. Even so, Hunt could not lawfully be held in indirect contempt in

---

**3.** As an aside, we note that the clerks of our Circuit Courts are elected in every county for a four-year term. Ind. Const. Art. 6 § 2. Historically, the clerks were elected to perform ministerial tasks and serve the judges who traveled the few circuits in the state. Although the number of courts has increased through the years, we have continued to separately elect our judges and circuit court clerks. In light of the expanded judiciary, perhaps the rationale for a separate election of court clerks and judges no longer exists in this day and age.

Indeed, a number of states have abandoned such a method of selection in an effort to transform the nature of the clerk's office to an entity that falls under the direction of the judges. For instance, in Missouri some circuits have a court administrator who performs the statutory functions of the circuit court clerk, including receiving and process-ing judgments and collecting and disbursing fines, costs, and child support payments in addition to other monies that the court directs. *See* http://www.courts.mo.gov/page.asp?id=631 (last visited Feb. 12, 2007.). Those Missouri counties with a charter form of government may be appointed pursuant to the charter. *Id.*

We also note that while the clerk of our Supreme Court was an elected position at one time, Indiana Code section 33–24–4–1—promulgated in 2004—provides that the Chief Justice of the Supreme Court now appoints the clerk. The clerk is paid a salary determined by the Supreme Court, and many of his or her duties are determined by the Supreme Court. *Id.* Hence, at least at the state level, the court clerk has become more responsible to the judiciary. We invite our general assembly to look at the organization of the local court systems.

these circumstances because he was not afforded the "array of due process protections" pursuant to Indiana Code sections 34–47–3–5 to –7.

Finally, in the event that Hunt failed to release any bond money that was owed to Holt, we find our Supreme Court's opinion in *Swift v. State ex rel. Clark,* 63 Ind. 81 (1878), instructive with regard to the liability of a court clerk. In *Swift,* a circuit court judge had ordered his clerk, Swift, to release monies to a third party that Swift was holding. After failing to release the funds, Swift was sentenced to ninety days in jail for contempt. On appeal, it was determined that a circuit court judge had no jurisdiction over any monies held by the clerk. *Id.* at 85. Rather, it was decided that the only remedy a third party may have to recover any monies so claimed is by a civil action against the clerk's bond. Specifically, the court observed that

> The act of March 9th, 1875, 2 R.S. 1876, p. 17, declares the liability of clerks on their official bonds for all moneys paid into court, under its order, to the person entitled to receive said money from them. The clerks are thus made the custodians of such moneys, and not the court. The refusal, therefore, of a clerk to pay out any such money to any person entitled to receive the same, constitutes a breach of his official bond, for which a civil action may be maintained as in other cases of improper refusal to pay out money in his hands as such clerk; and, when such money is fraudulently withheld, the clerk may be prosecuted for a felony. 2 R.S. 1876, p. 450. But we have no statute or precedent making even such fraudulent withholding a contempt of the authority of the court, of which he is the clerk.

*Id.* at 84. In addition to the above, Indiana Code section 33–32–4–4 provides in general that the "clerk is liable, with the clerk's sureties, on the clerk's official bond for all funds received to any person who is entitled to demand and receive those funds from the clerk." Therefore, it is apparent that Holt could maintain an action against Hunt for the return of the monies if he refused to release the funds that were due and owing on the bond. *Id.*

### CONCLUSION

In light of our discussion above, we conclude that the trial court erred in holding Hunt in direct criminal contempt. Indeed, Hunt's purported misrepresentations to the trial court regarding the release of Holt's bond rose to the level of indirect contempt—at best—which required notice, an opportunity to be heard, and other due process protections. Finally, in the event that Holt is owed money from the clerk's office that is due and unpaid, she may be permitted to file a separate cause of action against Hunt for the return of those funds.

The judgment of the trial court is reversed.

DARDEN, J., and ROBB, J., concur.