# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D15-4165

_____

ESTHER ASH,

     Appellant,

     v.

JOHN CAMPION,

     Appellee.

_____

On appeal from the Circuit Court for Duval County.
Linda F. McCallum, Judge.

February 5, 2018

WINSOR, J.

During a long and contentious divorce battle, the circuit court held Esther Ash in contempt and ordered her to pay $100,000 to her former husband, John Campion. Ash appeals, contending the sanctions order was unlawful.

Ash and Campion lived as a married couple for several years before separating in 2012. Campion initiated divorce proceedings, and the trial court entered a mutual injunction prohibiting each party from "physically or verbally harass[ing], molest[ing], or disturb[ing] the other" by phone or text message. The couple finalized the dissolution, but animosities persisted, culminating with Ash's sending Campion a slew of vitriolic text and voicemail messages. Some of Ash's less outrageous texts called Campion an

"evil, sick person," who "alienate[d] a child from [his] father" and who deserves to "rot in federal prison." Other messages—unfit for print here—said far worse.

Concerned that Ash would continue sending incendiary messages, Campion sought an order enforcing the mutual injunction. After a hearing, the trial court found Ash in contempt and ordered her to pay Campion $100,000.

On appeal, Ash does not defend her conduct. She does not claim her messages were anything but harassment or that they were permissible under the injunction. Instead, she argues that we must reverse the contempt order because the trial court did not satisfy necessary prerequisites.

"Contempt sanctions are broadly categorized as criminal or civil contempt." *Parisi v. Broward County*, 769 So. 2d 359, 363 (Fla. 2000). The distinction is critical because those facing criminal-contempt sanctions are entitled to protections not offered to those facing civil-contempt sanctions. *Id.*; *see also Pugliese v. Pugliese*, 347 So. 2d 422, 424 (Fla. 1977) ("[A] determination of whether an order is civil or criminal must be made."). In fact, those facing charges of criminal contempt—"a crime in the ordinary sense"— are entitled to the same protections as other criminal defendants. *Parisi*, 769 So. 2d at 363 (quoting *Int'l Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 831 (1994)). The Constitution provides some of those rights (right to counsel, proof beyond a reasonable doubt, etc.), *id.*, and our rules of criminal procedure provide still more, *see* Fla. R. Crim. P. 3.840.

There is no question that the trial court fell short of affording Ash the requisite protections for a criminal-contempt order. And there is no question that if the contempt order was criminal in nature, we therefore must reverse. *See Wendel v. Wendel*, 958 So. 2d 1039, 1040 (Fla. 1st DCA 2007) ("Noncompliance with rule 3.840 constitutes fundamental error."). Indeed, Campion makes no effort to defend the order as a lawful criminal-contempt sanction,

2

arguing instead that it was a valid *civil*-contempt order. But we cannot accept that argument.

We can consider a contempt fine civil only if it coerces the defendant into compliance with the court's order or compensates the other party for sustained losses. *See Parisi*, 769 So. 2d at 366; *see also Bagwell*, 512 U.S. at 829. We cannot consider this fine a coercive sanction because it includes no purge provision: there was nothing Ash could do to avoid the fine after the trial court imposed it. *See Parisi*, 769 So. 2d at 366. A punishment (like a $100,000 penalty) might deter future noncompliance (just as prison terms might deter future crimes), but that does not make it a coercive civil sanction. Regardless, any valid coercive civil sanction order must include a purge provision. *See id.* ("[I]n order to impose a valid coercive sanction, the trial court must . . . include a purge provision."). "Without this critical protection, there is a danger that the contempt sanction could be transformed from a civil to a criminal contempt sanction without any other underlying procedural protections attendant to criminal proceedings." *Id.* at 365.

Nor can we view this fine as a compensatory award. A contempt order designed to compensate must turn on "the injured party's actual loss." *Id.* at 366 (quoting *Johnson v. Bednar*, 573 So. 2d 822, 824 (Fla. 1991)). Campion argues here that the award sought to compensate him for emotional distress, but the record does not support that argument. There was no argument about loss below, there was no evidence about the value of any loss below, and the trial court made no findings about loss below. Campion himself testified that he didn't want compensation (insisting he'd give any award to charity anyway)—he "just want[ed] it to stop." Moreover, the court's announced purpose was to deter Ash from engaging in "unacceptable conduct," and it chose $100,000 only after Campion

3

argued "it's going to take a lot to get her attention."[1] This was not a compensatory order.

Rather than serve any remedial or compensatory purpose, the trial court's order "simply imposes a flat and unconditional fine," meaning it must be "considered a criminal sanction." *J-II Invs., Inc. v. Leon County*, 21 So. 3d 86, 90 (Fla. 1st DCA 2009); *accord Wendel*, 958 So. 2d at 1040. And because the trial court imposed a criminal sanction without complying with rule 3.840, our precedent requires us to find fundamental error.[2] *Wendel*, 958 So. 2d at 1040 ("Noncompliance with rule 3.840 constitutes fundamental error."); *Hunt v. State*, 659 So. 2d 363, 364 (Fla. 1st DCA 1995) (noting "unequivocal authority holding that noncompliance with the provisions of Rule 3.840 constitutes fundamental error").

REVERSED.

LEWIS, J., concurs; MAKAR, J., dissents with opinion.

———————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

———————————————

---

[1] The record shows that the court considered Ash's substantial wealth in determining the sanction. Ash's ability to pay is irrelevant in measuring Campion's actual losses.

[2] Because we reverse on these grounds, we do not address Ash's separate argument that the court should have granted her a continuance before the contempt hearing.

4

MAKAR, J., dissenting.

In this rancorous and affluent dissolution case, Esther Ash appeals a $100,000 contempt order arising from her multiple violations of a 2012 mutual consent agreement saying that neither she nor her then-husband "shall physically or verbally harass, molest or disturb the other, in person, by phone, through email or text messaging." In flagrant disregard of her agreement, Ash sent numerous harassing photographs, text messages, and voicemails that, charitably, can be described as outrageous, profane, and vile. After a noticed hearing, the trial court entered the contempt order at issue.

On appeal, Ash's appellate counsel asserts a number of issues, but none were raised in the trial court except Ash's belated request for a continuance of the contempt hearing. But it was not an abuse of discretion to deny a motion for continuance—first made halfway through the hearing—given Ash's ongoing pattern of delay by dismissing her lawyers before important court proceedings and seeking continuances, four of the trial itself. *See, e.g., Cargile-Schrage v. Schrage*, 908 So. 2d 528, 529 (Fla. 4th DCA 2005) (no abuse of discretion to deny continuance that would have allowed third attorney in nine months to appear on movant's behalf). The trial judge saw firsthand this "fire attorney, seek continuance" method of avoidance, which occurred on the eve of the scheduled contempt hearing (this pattern continued on appeal, Ash's appellate counsel moving to withdraw shortly before oral argument because he had been "discharged"). Just before the contempt hearing, Ash terminated her then-trial attorney (approximately the tenth to represent her), sending a new one the next day, who arrived mid-hearing to request a continuance. He stayed for the rest of the contempt hearing, but didn't participate, saying his authority was limited only to appear and present the motion for continuance. Due to the restrictions Ash placed upon him, therefore, no objections to the contempt order were presented and no points preserved for appellate review. And Ash's counsel

5

did nothing thereafter to contest the contempt order, such as a motion for rehearing or the like.

Consequently, every issue raised in this appeal as to the contempt order is new and unpreserved, making our standard of review one of fundamental error. As we recently said:

> [W]e cannot reverse on this unpreserved claim of error absent fundamental error, which is one that "goes to the foundation of the case or goes to the merits of the cause of action." *Sanford v. Rubin*, 237 So.2d 134, 137 (Fla.1970). An appellate court "should exercise its discretion under the doctrine of fundamental error very guardedly." *Id.* To do otherwise would undermine the orderly adjudication of claims and inject a degree of arbitrariness into the appellate process.

*Yau v. IWDWarriors, Corp.*, 144 So. 3d 557, 560 (Fla. 1st DCA 2014) (unauthorized award of attorney's fees not fundamental error). We noted in *Yau* that "there are only a limited category of errors that 'courts universally allow to be raised for the first time on appeal because of the very nature of the error' including subject matter jurisdiction and judgments entered without notice that deny due process." *Id.* (citation omitted).

Neither category applies here: the trial court had jurisdiction, and Ash had notice of the contempt hearing and judgment and was therefore afforded due process. She was on notice of the hearing, but nonetheless chose to fire her lawyer at the eleventh hour, sending a new one with next to no authority to act on her behalf who arrived mid-hearing; she thereafter failed to contest the contempt order in the trial court and chose instead to appeal. Precisely like Yau, who "was on notice of the alleged deficiency in her pleading and given a full opportunity to explain why her client's case should not be dismissed and why no sanctions should be imposed," Ash too was on notice of the contempt hearing but chose essentially to boycott it. *Id.*

6

On appeal, Ash seeks to restyle the trial court's order as one sounding exclusively in criminal contempt, rather than a civil contempt order, based on some of the language used ("sanctions"), the lack of a purge provision, and the former husband's testimony that he didn't want her money and would give a sanctions award to charity ("I'm not looking to get money out of her."). But the "same contemptuous conduct may be the subject of both criminal and civil proceedings," and the elusive "distinction between criminal and civil contempt often turns on the 'character and purpose' of the sanctions involved." *Parisi v. Broward Cnty.*, 769 So. 2d 359, 363-64 (Fla. 2000) (citation omitted). On this point, the proceeding below and the contempt order itself were intended solely to effectuate a civil contempt remedy via the imposition of sanctions, whose purpose could be compensatory or coercive, or both. Either are permissible. *Id.* at 363 ("Civil contempt sanctions are . . . classified as either compensatory or coercive sanctions.").

The clear purpose of the contempt order was "remedial" and "for the benefit of the complainant [Campion]," making it quintessentially civil in nature. *Id.* at 364. It enforced only individual rights of privacy and dignity, a hallmark of a civil contempt order. The order did not subject Ash to potential incarceration, attempt to punish her for her litigation tactics, or otherwise vindicate the authority of the court; it thereby lacked the characteristics of a criminal contempt order. Instead, the order only enforced the parties' private agreement to not "physically or verbally harass, molest or disturb" one another.

Characterizing the civil contempt order as compensatory, Campion vigorously argues on appeal that the record shows that Ash's "willful, profane and repeated" misconduct was "totally outside the bounds of all common decency," causing him (and his family) anguish and severe emotional distress. The evidence easily shows that Campion suffered substantial harm resulting from Ash's contemptuous conduct. *Id.* at 366. His trial counsel's suggestion of ten-thousand dollars apiece for the ten incidents, each outrageous in its own way, was wholly reasonable on this

7

record, the former husband's non-enforceable pledge to give the money to charity notwithstanding. One incident, involving unsolicited pictures Ash sent of the couple's son appearing severely injured in a hospital bed at an undisclosed location (turns out he was getting liposuction in Los Angeles), could alone support a tort verdict of $100,000 in a civil case. ("I thought it was extremely cruel . . . I was completely and utterly shocked and traumatized by this . . . to think that my mother [who was 92 and just suffered a stroke] and son on the same day were in very, very critical condition was not something I'll get over any time soon."). Indisputably, the record shows conduct amounting to intentional infliction of emotional distress, easily meeting the "Outrageous!" test. *Johnson v. Thigpen*, 788 So. 2d 410, 413 (Fla. 1st DCA 2001) (conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. . . . [a case whose] recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'").

Where a civil contempt is sustainable as compensatory—as it is in this case—no purge is necessary. *Gregory v. Rice*, 727 So. 2d 251, 253 (Fla. 1999) ("Only if the fine is compensatory is it appropriate to dispense with a purge provision."). The reason is obvious: compensatory fines provide recompense for *past* harm, leaving nothing to purge. A coercive fine, in contrast, compels *future* compliance with an order, an example being a $5,000 fine for not turning over discovery documents or failing to deliver property under a marital agreement. Here, Ash claims that the contempt order was coercive and required to have a purge, but nothing in the order's remedial terms was "coercive" as to her possible *future* behavior. Instead, the contempt order imposed a compensatory sanction for her *past* "willful violations" of the non-harassment order arising from "her ongoing pattern of repeated offensive communications directed to [Campion] and his family" that were "extremely inappropriate, outrageous and unacceptable" thereby constituting "significant harassment." As to possible

8

*future* misconduct, the order stated that if Ash "communicates with [Campion] or his family in a similar manner in the future, necessitating another motion for enforcement, the Court will *consider* imposition of more severe sanctions." (Emphasis added). This language imposed no enforceable coercive sanction; it merely intimates that Ash *might* be subject to stiffer sanctions if her behavior were to recur. No purge was necessary, either as to the compensatory contempt sanction or as to this latter statement, whose obvious purpose was to warn Ash against repeat behavior.

\* \* \*

This case presents no basis for fundamental error review or reclassification of the contempt order on appeal as solely a criminal matter; the order is sustainable solely as a valid compensatory civil sanction. Further, due process is not denied when a client disregards the need for orderly judicial proceedings by repeatedly terminating her lawyers and frittering away their ability to preserve potential legal errors and advocate on her behalf. Principles of judicial restraint, which reserve fundamental error analysis for only the truly meritorious cases, require affirmance of the contempt order, short of which flouting court orders and provoking disorderly adjudication are rewarded.

_____

Esther Ash, pro se, Appellant.

Michael J. Korn of Korn & Zehmer, P.A., Jacksonville, and Harold E. Patricoff of Shutts & Bowen LLP, Miami, for Appellee.

9